LILLER *v.* LOGSDON ET AL.

[No. 378, September Term, 1970.]

*Decided April 6, 1971.*

The cause was argued before HAMMOND, C. J., and SINGLEY, SMITH and DIGGES, JJ., and CHARLES E. ORTH, JR., Associate Judge of the Court of Special Appeals, specially assigned.

*Robert H. Reinhart* for appellant.

*Louis A. Fatkin* for appellees.

SMITH, J., delivered the opinion of the Court.

This case involves the question of whether mining operations at an Allegany County coal mine had ceased, thereby bringing to an end an easement, the agreement relative to which provided that it would be "automatically terminate[d] one year after mining operations cease[d]."

Appellant Chelsie A. Liller (Liller) and James C. Logsdon and Mary W. Logsdon, his wife, entered into the agreement in 1960. Mr. Logsdon is now deceased and the property is owned by appellees Mary W. Logsdon and Mary Ellen Lasser who brought a bill in equity on Feb. 20, 1970, to enjoin Liller from further use of the roadway. The chancellor concluded these operations had ceased and, therefore, the easement had terminated. We shall affirm his decree.

There is an intimation in the brief of the appellees that Liller had had the instrument prepared, but we note no statement in the evidence to that effect. The easement was granted "as a means of egress and ingress for trucks, vehicles, and equipment moving to and from strip mining operations conducted or to be conducted by [Liller], his heirs or assigns on property [then] occupied, leased or owned by him or which [might] in the future be owned by him and generally referred to as the 'Chapman' tract." The last sentence stated:

> "This Easement automatically terminates one year after mining operations cease."

We approach this case bearing in mind that under Maryland Rule 886, the matter having been heard by the trial court without a jury, the evidence is to be viewed in the light most favorable to the party prevailing below, *Burroughs Int'l Co. v. Datronics,* 254 Md. 327, 337, 255 A. 2d 341 (1969), and *Goodwin v. Lumbermens Mut. Cas. Co.,* 199 Md. 121, 129-30, 85 A. 2d 759 (1952), and bearing in mind also that under that rule "the judgment of the lower court will not be set aside on the evidence un-

less clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses."

At the time the easement was granted Liller was conducting both deep and strip mining operations on the property owned by him near the Logsdon property. He made use of the easement until June of 1964 when he removed his equipment to another location and leased the mine workings and mining rights to Lionel Clark. The chancellor found that Clark removed approximately 513 tons of coal "until sometime during the year 1966." He further found that on August 18, 1967, Liller "leased the mining tract to Peter J. Colmer, who removed, without strip mining, the following amounts of coal: 1967, one hundred nine tons; 1968, twenty-five tons; and 1969, six tons." The only part of this finding of facts with which Liller takes issue is the chancellor's finding that Colmer's removal of coal was "without strip mining". Colmer testified that deep mining ended in 1968 when the mine inspector closed down the mine, but he said he "took coal off of the strip jobs after that." He "picked up loose coal that was around on the strip job". He told the court that the last coal he remembered removing was "about the first of July, 1969", although the record showed the last (and only) royalty paid by him in 1969 was on March 14 in the amount of $3.00, which would have been for six tons.

In the view we take of this case we conclude that it is not necessary to determine whether removal of the coal from seams previously uncovered by Liller constituted strip mining.

As the chancellor put it:

"In order to be a 'mining operation' the activity of removing coal would have to be reasonably continuous. The removal of a shovel full of coal, six tons of coal, or twenty-five tons of coal, each within one full year, cannot be properly termed a mining operation. Even if the ac-

"tivities of Colmer could be determined to be a mining operation, the Court is of the opinion that the intent of the parties at the time of the execution of the easement agreement was that the mining operation intended to be conducted was a strip mining operation. Since the strip mining operation ceased in June, 1964, one year thereafter the easement 'automatically' terminated."

In construing contracts, words are to be given their ordinary meaning. *Mascaro v. Snelling and Snelling,* 250 Md. 215, 229, 243 A. 2d 1 (1968). "Cease" is defined in *Webster's Third New International Dictionary* (unabridged ed. 1961) :

"to leave off: bring to an end * * * to come to an end: break off or taper off to a stop * * * to give over or bring to an end an activity or action".

The same authority defines "operations" as "the whole process of planning for and operating a business or other organized unit", while defining "mining" as "the process or business of making or of working mines". In *The Random House Dictionary of the English Language* (unabridged ed. 1967) "operation" is defined as "a course or procedure of productive or industrial activity".

What was here involved was not the question of abandonment of an easement where the element of intent must be involved. *See, e.g., Maryland and Pa. R.R. v. Mer.-Safe, Etc., Co.,* 224 Md. 34, 166 A. 2d 247 (1960), and *Canton Co. v. Baltimore & O.R.R.,* 99 Md. 202, 57 A. 637 (1904). The parties here by their agreement chose to specify what events would cause the easement to lapse just as in the zoning ordinance in *Canada's Tavern v. Glen Echo,* 260 Md. 206, 271 A. 2d 664 (1970), the legislative body specified when a nonconforming use would be deemed to have passed out of legal existence.

The words "mining operations" in the context of this

agreement surely connote a mining business, not the picking up of a few truck loads of coal, which, in the language of Colmer, might have been "uncovered laying there". We are unable to equate the removal of six tons of coal in the year 1969 with the carrying on of mining operations. When coupled with the fact that the total coal removed in 1968 was but 25 tons, it follows that the chancellor did not err in concluding that mining operations had ceased more than one year prior to the filing of the bill of complaint in February of 1970, thereby terminating the easement.

*Decree affirmed; appellant to pay the costs.*