## U.S.I.F. TRIANGLE TOWERS CORPORATION
## *v.* ROCKWOOD DEVELOPMENT
## COMPANY

[No. 357, September Term, 1970.]

*Decided April 8, 1971.*

*Motion for rehearing filed May 7, 1971; denied May 11, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Arthur J. Delaney,* with whom were *Steven A. Winkelman* and *Winkelman & Delaney* on the brief, for appellant.

*Charles R. Donnenfeld,* with whom were *Michael C. Russ, Arent, Fox, Kintner, Plotkin & Kahn, Robert L. Burchett* and *Miller, Miller & Canby* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

This case calls for a determination of the meaning of the phrase "net cash flow", used in a purchase money deed of trust securing deed of trust notes aggregating $850,000.

In March of 1969, Rockwood Development Company (Rockwood), a partnership, sold to U.S.I.F. Triangle Towers Corporation (Triangle Towers) a 260-apartment complex in Bethesda. The purchase price, stated by the contract to be $4,935,000, consisted of three components: $750,000 in cash, to be paid at time of closing; the taking of title subject to a first trust on the property securing notes in the amount of $3,335,000, held by The Riggs National Bank; and three purchase money notes in the aggregate amount of $850,000, bearing no interest, secured by a second deed of trust.

The first of the three notes, for $150,000, was payable two years after the closing; the second, for $100,000, was payable four years after the closing, and the third note, for $600,000, was to be paid in the manner prescribed by a formula set forth in the contract, the text of which was later incorporated in the second deed of trust and in the $600,000 note which the deed of trust secured. It is the third note, and the payments to be made during the two years accounting from 28 March 1969, when closing was had, which here concern us.

The deed of trust and the note provided:

"During each of the first Two (2) years from the date hereof, if net cash flow (as hereinafter defined) exceeds Seventy-five Thousand Dollars ($75,000.00), the excess of such cash flow over Seventy-five Thousand Dollars ($75,000.-00) shall be paid by Maker [Triangle Towers]

to the Party Secured [Rockwood] in reduction of the promissory note and this Deed of Trust; however, if net cash flow (as hereinafter defined) in either such year is less than One Hundred Fifteen Thousand Dollars ($115,000.00), said promissory note and Deed of Trust shall be reduced by the sum of Forty Thousand Dollars ($40,000.00) in such year in any event, regardless of the amount of cash, if any, that is paid by Maker to the Party Secured in any such year against said promissory note and Deed of Trust."

In a subsequent paragraph "net cash flow" was defined:

" 'Net Cash Flow' as utilized herein, shall be defined to be the net cash proceeds and collections from the operation of the property being bought and sold under the Contract after deducting all items of expense, including, but not limited to debt service, insurance, real estate taxes, personal property taxes, payment of all utility bills, payment of all leasing commissions, direct management, maintenance, improvements, repairs, employees, and all other expenses necessary and incident to the operation of the real property and the improvements thereon. *It is understood and agreed that (1) capital improvements; (2) amortization on principal;* and (3) management fees other than those directly attributable to the operation of the subject property, *are not to be included as items of expense in determining net cash flow.* The determination of net cash flow, governed by the foregoing definition, shall be made in accordance with generally accepted accounting principles." (Emphasis supplied.)

Subsequent to 31 March 1970, Triangle Towers prepared and submitted to Rockwood an income and expense statement for the 12 months ended on that date. From

income of $684,457.11 there were deducted operating expenses of $554,746.63 (including interest of $197,831.89 paid on the first trust) leaving an income balance of $129,710.48. From this amount there were deducted payments of $65,282.05 in amortization of the principal of the first trust, leaving an amount of $64,428.43 which was described as "net cash flow." If Triangle Towers' determination of net cash flow had been correct, not only would no payment in reduction of the $600,000 note have been required (because $64,428.43 is less than $75,000) but Rockwood would have been required to reduce the principal amount of the note by $40,000 (because $64,-428.43 is less than $115,000).

Rockwood rejected the Triangle Towers computation, and demanded $54,710.48, the amount developed by deducting $75,000 from operating income of $129,710.48, without giving effect to amounts paid in reduction of the principal of the first trust. Triangle Towers made the payment and then sought declaratory and injunctive relief and a recovery of the amount paid in an action which it brought in the Circuit Court for Montgomery County. The case came on for hearing on Rockwood's motion for summary judgment. From an order granting the motion and dismissing its bill of complaint Triangle Towers has appealed.

At the outset, it might be well to note that the determination of cash flow is a mechanism developed by financial analysts rather than an accounting concept. In its simplest form, it involves the addition of depreciation to net income. In more sophisticated projections, it may also involve adding back expenses which have been accrued but not paid and deducting income which has been accrued but not collected. It is normally used as a method of determining the availability of funds needed for capital expenditures, for the reduction of debt, or for the payment of dividends. See Ferst, *Basic Accounting for Lawyers* at 56-57 (2d ed. 1965); Casey, *Accounting Desk Book* ¶¶ 3102-3102.3 (1969); Finney and Miller, *Principles of Accounting Intermediate* at 464 (6th ed. 1965).

The pertinent provisions which appeared in the contract of sale, in the second deed of trust and in the $600,-000 note are virtually identical. The term used was "net cash flow" and it was carefully defined as "net cash proceeds and collections from the operation of the property", after the deduction of all items of expense necessary and incident to the operation of the property and improvements, including debt service. Even admitting, as Triangle Towers contends, that the term "debt service" when used without qualification usually includes payments of matured principal as well as interest, Kohler, *A Dictionary for Accountants* at 160 (3d ed. 1965), it is clear that this was not contemplated by the parties, for they followed the enumeration of expense items, including debt service, with the provision:

> "It is understood and agreed that (1) capital improvements; (2) amortization on principal * * * are not to be included as items of expense in determining net cash flow."

It is scarcely necessary to repeat what we have said time and again: that when the language of a contract is clear and unambiguous, the true test of what was meant is not what a party to the contract may have intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. *Seldeen v. Canby*, 259 Md. 526, 531, 270 A. 2d 485 (1970); *Katz v. Pratt St. Realty Co.*, 257 Md. 103, 120, 262 A. 2d 540 (1970); *Devereux v. Berger*, 253 Md. 264, 269, 252 A. 2d 469 (1969); *Pemrock, Inc. v. Essco Co.*, 252 Md. 374, 383, 249 A. 2d 711 (1969); *Sands v. Sands*, 252 Md. 137, 143, 249 A. 2d 187 (1969); *Chesapeake Isle, Inc. v. Rolling Hills Dev. Co.*, 248 Md. 449, 453, 237 A. 2d 1 (1968); *Lawless v. Merrick*, 227 Md. 65, 71, 175 A. 2d 27 (1961); *Meyers v. Jacham Enterprises, Inc.*, 225 Md. 86, 94, 169 A. 2d 415 (1961); *Slice v. Carozza Properties, Inc.*, 215 Md. 357, 368, 137 A. 2d 687 (1958); *Weber v. Crown Central Petroleum Corp.*, 214 Md. 115, 121, 132 A. 2d 857 (1957); *Strickler Eng'r Corp. v. Seminar, Inc.*,

210 Md. 93, 100, 122 A. 2d 563 (1956) ; *Ray v. Eurice,* 201 Md. 115, 127, 93 A. 2d 272 (1952) ; Restatement, *Contracts* § 230 at 310 (1932).

Perhaps the sharpest articulation of the rule is found in *Slice v. Carozza Properties, Inc., supra,* where Chief Judge Brune, speaking for the Court, said at 368 of 215 Md. :

> "As we turn to the authorities, we may note first that the theory of 'objective law' of contracts has been almost universally adopted by this time. The written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding, or unless there is fraud, duress or mutual mistake. *Ray v. Eurice,* 201 Md. 115, 93 A. 2d 272. '* * * where there has been an integration of an agreement, those who executed it will not be allowed to place their own interpretation on what it means or was intended tó mean. The test in such case is objective and not subjective. * * * *Williston* * * * Sec. 94, page 294, says: "It follows that the test of a true interpretation of an offer or acceptance is not what the party making it thought it meant or intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." ' *Ray v. Eurice, supra,* p. 127."

Triangle Towers would by several arguments divert us from the high road of objective law into the thicket where ambiguous provisions must be construed or interpreted, as was the case in *Sorensen v. J. H. Lawrence Co.,* 197 Md. 331, 336, 79 A. 2d 382 (1951) and in *Highley v. Phillips,* 176 Md. 463, 471-72, 5 A. 2d 824 (1939) which are typical of the cases on which they rely. They would have us consider *Sagner v. Glenangus Farms,* 234 Md.

156, 167, 198 A. 2d 277 (1964), where extrinsic evidence was admitted in aid of construction, because there had been no objection from either side and *Born v. Hammond,* 218 Md. 184, 188-89, 146 A. 2d 44 (1958), which adopted the familiar rule that if a contract is susceptible of two constructions, the court will select that which carries out the purpose of the agreement.

The first contention is that all of the negotiations which preceded the execution of the contract contemplated a cash flow, after amortization of the first trust, of between $95,000 and $106,000 annually, and that the minimum annual credit of $40,000, in a year when payments in reduction of the note were less than this amount, was intended to effect a downward adjustment of purchase price in the event that net cash flow fell below $115,000. Triangle Towers says that a projected income and expense statement prepared by Rockwood and attached to the contract of sale forecast a cash flow of $95,000 after interest and amortization payments on the first trust. It should be noted that the projection clearly postulated gross rental income of $701,256, predicated on 100% occupancy, and no increase in expenses. Triangle Towers does not challenge the accuracy of the projection, possibly because under the terms of the contract, it had an opportunity to audit the projection prior to settlement, but only urges its consideration as an aid to interpreting the contract.

In additional support of its contention, Triangle Towers cites the explanatory example set out in the second deed of trust:

> "If in the first year, there is only Thirty-five Thousand Dollars ($35,000.00) excess cash (over the Seventy-five Thousand Dollars ($75,000.-00) net cash flow figure for that year), and therefore, a Five Thousand Dollar ($5,000.00) credit must be used to reduce the promissory note and this Deed of Trust, then if during the next year (the second year), there is Forty-five

Thousand Dollars ($45,000.00) in excess cash (over the Seventy-five Thousand Dollar ($75,-000.00) net cash flow figure for that year), Forty Thousand Dollars ($40,000.00) thereof will be paid as the cash payment to reduce the promissory note and this Deed of Trust and the extra Five Thousand Dollars ($5,000.00) will be paid to the Party Secured without debit to the promissory note and this Deed of Trust reduction, and so on, with a yearly plus and minus accounting, both to years forward and to years backward, as the case may be, until the Six Hundred Thousand Dollar ($600,000.00) purchase money note and this Deed of Trust are fully satisfied."

The difficulty is that the example, as we see it, offers no more support to Triangle Towers than it does to Rockwood, since it entirely hinges on the definition of net cash flow.

Next, Triangle Towers argues that the $75,000 which it may retain was intended to insure a 10% return on its cash commitment of $750,000, and that to hold it to this figure before amortization of principal eliminates all profit from the transaction. It endeavors to buttress this argument by pointing out that the $75,000 figure goes to $90,000 in 1971 when payment of the first note increases its commitment to $900,000, and to $100,000 in 1973 when payment of the second note increases the cash investment to $1,000,000. At the same time, the minimum amount by which the note must be reduced, regardless of the amount paid, goes to $45,000 and then to $55,000. It so happens that the mathematics work out neatly. But it might be argued with equal force that Triangle Towers is confusing profit with cash return, and that a cash return might have been of less consequence to it than the tax advantages which might be achieved from depreciation. Or it may well be that the $75,000, $90,000, and $100,000 minima were tailored to meet the amortization payments un-

der the first trust, which in Triangle Towers' first fiscal year were some $65,000, and conceivably could increase under a level payment mortgage.

Finally, Triangle Towers argues that the exclusion of payments in amortization of principal in the definition of net cash flow was intended to apply to amortization of the second trust but not the first. The short answer to this is that if the parties had so intended, they should have said so. It is quite apparent that the officers of Triangle Towers and the principals of Rockwood were not only knowledgeable in real estate matters but were represented in the negotiation of the purchase and sale by competent counsel. Whatever Triangle Towers may have intended at the outset, it is clear from the record that the contract which ultimately evolved was the integration of a give and take negotiation in which both sides actively participated in the development of the concept of net cash flow. On its face, the provision is clear and unambiguous, and Triangle Towers cannot by argument make it less so.

*Order affirmed; costs to be paid by appellant.*