## THE KASTEN CONSTRUCTION COMPANY, INC.
### *v.* ROD ENTERPRISES, INC.

[No. 134, September Term, 1972.]

*Decided March 7, 1973.*

*Motion for rehearing filed March 15, 1973; denied March 23, 1973.*

The cause was argued on January 15, 1973, before MURPHY, C. J., and SINGLEY, SMITH, DIGGES and LEVINE, JJ., and reargued on February 5, 1973, before MURPHY, C. J., and BARNES, SINGLEY, SMITH, DIGGES and LEVINE, JJ., and JERROLD V. POWERS, Associate Judge of the Court of Special Appeals, specially assigned.

*Charles C. W. Atwater,* with whom were *Dwight C. Stone* and *Mylander, Atwater, Carney & Stone* on the brief, for appellant.

*Francis D. Murnaghan, Jr.,* with whom was *Robert A. Dietz* on the brief for appellee.

LEVINE, J., delivered the opinion of the Court. MURPHY, C. J., and SINGLEY and SMITH, JJ., dissent and MURPHY, C. J., filed a dissenting opinion in which SINGLEY and SMITH, JJ., concur at page 331 *infra.*

This appeal by The Kasten Construction Company, Inc. (Kasten) is from a judgment for costs entered in favor of Rod Enterprises, Inc. (Rod) by the Circuit Court for Anne Arundel County (Wray, J.), where the case was tried without a jury. Kasten had sued Rod for damages allegedly sustained by reason of Rod's breach of a contract providing for the sale of approximately seventy-eight acres of subdivided building lots from Kasten to Rod. A difference of opinion regarding the interpretation of that contract has led to this dispute.

The land which is the subject of this litigation was acquired by Kasten in 1965. It is described as "Winchester Estates" and is located on Ritchie Highway in the Third Election District of Anne Arundel County. Although it was ultimately decided that homes would be built and sold, the land was initially acquired with the intention of developing and then selling the lots.

A construction loan in the original sum of $229,000 was obtained from Annapolis Federal Savings and Loan Association (Annapolis Federal) in December, 1965. Of this amount, $90,000 was held in escrow by Annapolis Federal to be applied towards the installation of roads, storm drains and utilities. It was estimated that this sum would cover 81% of the road installation costs and 85% of the storm drain costs. From time to time, Annapolis Federal released sums of money from the escrow fund to pay invoices related to construction of roads and storm drains.

In pursuance of its development of the tract, Kasten was required to enter into a series of "public works agreements" with Anne Arundel County (the county), to which Annapolis Federal was also a party, whereby Kasten agreed to construct its roads in accordance with county requirements by a specified date and to file a performance bond. Also, a storm drain system was required for the group of roads covered by each contract. As each group or section was approved by the county, Kasten was to undertake maintenance of the completed roads for one year with the performance bond being supplanted by a maintenance bond for that period of time. At the end of the one-year span, the roads would be accepted by the county and Kasten would be discharged from its contract and bond responsibilities.

Although the public works contract covering the first group of roads was apparently performed to the county's satisfaction and had reached the maintenance stage, Kasten found itself in straitened circumstances by early 1968, and decided to sell its tract. Actually, the inspiration for selling originated with Kasten's investors, as well as Annapolis Federal, who were anxiously casting about for someone to "take over" the development commitments and protect their interests. These efforts led to the arrival of Rod which, through its principal, Tomas Rodriguez, contracted on March 11, 1968 to purchase Kasten's land.

Previously, on August 21, 1967, Kasten had entered into another "public works agreement" with the county which, in a manner similar to the earlier agreement, governed the development of the second section of roads and related storm drain facilities. The performance bond under this agreement was in the amount of $18,500, which was the sum arrived at as liquidated damages to be awarded the county in the event of a failure to perform by Kasten. The deadline for performance under this agreement was September 1, 1968.

As we noted earlier, $90,000 had been withheld in escrow to cover most of the cost originally allocated for completion of the subdivision roads and storm drains. When the parties entered into their contract on March 11, 1968, the escrow balance had been reduced to approximately $45,000. Annapolis Federal had disbursed the remainder by the payment of invoices received from Kasten or its subcontractor, and upon satisfactory evidence received from the county.

In the course of disbursing the first $45,000, Annapolis Federal came into possession of two letters from the Anne Arundel County Department of Public Works. The first, addressed to Kasten, was dated June 22, 1966, and read:

> "This is to advise that a recent field inspection indicates all the storm drainage has been constructed in Winchester Estates according to approved plans and county standards and is acceptable to the Department of Public Works."

The second, addressed: "TO WHOM IT MAY CONCERN," was dated December 21, 1967, and read:

> "A Bond for the construction of roads, including storm drainage, in the Sub-division of Winchester Estates has been posted with the Department of Public Works and all work related to this Bond has been done under the supervi-

sion of a Department of Public Works Inspector."

Annapolis Federal says it interpreted the first letter to mean that all the storm drainage in the entire subdivision had been completed; for that reason, it says, it released at that time the entire $18,000 which had been held in escrow for that purpose. It interpreted the second letter to mean that all road work covered by the "public works agreement" of August 21, 1967 and the accompanying performance bond had been completed, and, having read the letter in that manner, on January 4, 1968 released the sum of $6,156.55 to the road-paving contractor, Reliable Contracting Co., Inc., and thereby reduced the escrow balance to $45,000.

The sales contract was drafted by Samuel M. Ivrey (Ivrey), attorney for Annapolis Federal, whose interests he was principally concerned with protecting; his fee in this instance, however, was paid by Rod. The disputed provision of the contract states:

"It is further agreed between The Kasten Construction Company, Inc., and Rod Enterprises, Inc., that the sum of Forty-five Thousand ($45,-000.00) Dollars now held in an escrow account in Trust at Annapolis Federal Savings and Loan Association, being the balance of undisbursed funds of loans in process in re: the mortgage from [Kasten] to [Annapolis Federal] . . . shall be assigned to the buyer, Rod Enterprises, Inc., by the Seller and shall be used by the purchaser for completion of *all* paving, etc. in regard the streets, etc., of the subdivision." (emphasis added)

Although this case focuses on the interpretation of that language, there are other provisions which we regard as material. The contract contemplated a variable purchase price substantially in excess of $200,000, and pro-

vided for settlement to be held nine days after it was executed. The contract also contained the following:

"The Kasten Construction Company, Inc. shall be responsible for *grading, seeding, sidewalks, driveways,* which work is to be done in regard *houses which are presently under construction.* Upon completion of the work within 60 days from date of settlement, [Kasten] will furnish [Rod] within ninety (90) days from date of settlement with a completed and properly executed Release of Mechanic's Liens for all contractors, subcontractors, suppliers, etc., who have provided work or materials for said work (grading, seeding, sidewalks, driveways) pertaining to the newly constructed houses. Upon the failure of [Kasten] to so do, any and all unpaid bills will be presented to [Rod] and which amounts are to be deducted from the said note of Fifteen Thousand ($15,000.00). *If [Kasten] fails to do this work* within the assigned period of time, then [Rod] *is hereby authorized and directed to have the work done and to deduct the cost* from the Fifteen Thousand ($15,000.00) Dollar Note.

\* \* \*

"[Kasten] is to remove all its equipment from the premises within 24 hours after settlement.

\* \* \*

". . . [T]his contract contains the final and entire agreement between the parties hereto, and that they shall not be bound by any terms, conditions, statements, warranties or representatives [sic], oral or written, not herein contained." (emphasis added)

The parties settled on the appointed date and Rod carried on with the development of the subdivision. On

July 24, 1970, however, the county filed suit against Kasten on the second "public works agreement" and accompanying performance bond. Although a defense of the suit was undertaken by Kasten and its surety, for which a rather sizable bill was incurred for attorney fees and is asserted as an element of damage in this case, those efforts were fruitless. On the basis that the sum of $18,-500 was a stipulation of liquidated damages, judgment was entered for the full sum, even though part of the work called for by the agreement had been completed.

As the direct result of that judgment, Kasten filed suit against Rod, claiming that it had been damaged by Rod's breach of its agreement to complete "all" paving of streets and storm drain work in the subdivision. The principal items of damage asserted are the $18,500, representing the amount of the county's judgment against Kasten, and the attorney fees for the unsuccessful defense.

At the trial, Rod conceded that Kasten had performed its obligations under the sales contract, but denied that it had committed a breach. We should note here that in the testimony, both sides made liberal reference to negotiations and related matters occurring prior to execution of the contract. The essence of Rod's twofold position in the trial court was: That it knew when it executed the sales contract—having been so informed by Kasten and Annapolis Federal—that a section of roads and storm drains was governed by the "public works agreement" of August 21, 1967 (frequently referred to as "Phase II") and its related performance bond. Rodriguez says he understood that since Kasten was "bonded" under those two instruments for "Phase II," Rod was not obligating itself under the sales contract to complete that portion of the work.

The other theme presented by Rod which, as Kasten suggests, appears to be contradictory to its first, was that in the negotiation stage, it had been assured, principally by Annapolis Federal, that the "Phase II" roads

and storm drains had already been completed. The following colloquy in Rodriguez's testimony is revealing:

"Why did you sign a contract then saying that you would use these funds for the completion of all paving and so forth in regard to streets and so forth of the subdivision? A. *It is my understanding* that it had nothing to do with section two. It was strictly for roads that had not been paved.

"The words not bonded or bonded appear nowhere in this agreement, do they? A. Not in that agreement, they do not appear.

\* \* \*

"If you expected Kasten Construction to have any more obligations to do work in your subdivision, why didn't you say so in your agreement? A. It was *my interpretation*—I didn't expect Mr. Meeks [Kasten] to do anything except what he represent to me and that was that section two was completed and ready for me to start building. . . ." (emphasis added)

Considerable emphasis was placed below by Rod and its witnesses on the two letters we quoted earlier which had been received from the Public Works Department. It is apparent from the record that those exhibits were seized upon for the contention that the "Phase II" work had been represented as completed. Interestingly enough, the record also discloses that Mr. Rodriguez "walked" the entire site and visited the Public Works Department before signing the sales contract; and that an experienced builder would have observed that the roads covered by the critical "public works agreement" and bond had not been completed and some were even in a raw state with trees yet standing. Indeed, Mr. Rodriguez acknowledged that he made those observations, but says he nevertheless relied on the letters and bond.

That the trial judge, in entering judgment for Rod, was also persuaded by the letters is clearly reflected by the concluding portion of his opinion in which he said:

"Kasten argues that the contract is not ambiguous, and if it is, it must be construed strictly against Rod, who paid for its preparation. It says Rod undertook to complete 'all' unfinished streets and storm drains, including those still not finished in Phase II.

"The legal principles Kasten urges are honored ones, but not applicable here. 'All' is ambiguous, but *only* because of the Department of Public Works' letters Kasten submitted to Annapolis Federal. *From them, Annapolis Federal and Ivrey* 'knew' that the work in Phase II was complete—while Kasten knew in truth that it was not complete. With *Ivrey's understanding* of the circumstances, *'all' could mean only the work remaining after Phase II,* and would not include any work remaining to be done in Phase II. Judgment will be entered for the Defendant." (emphasis added)

Kasten contends here that the trial judge erred in deciding that the contested provision of the contract was ambiguous, and in relying upon other evidence to ascertain the intent of the parties. It argues that since the contract was clear and unambiguous on its face in requiring Rod to complete "all" roads and storm drain work in Winchester Estates, the court should not have interpreted it according to what Rod says its understanding or intent was.

It also contends that Rod was not entitled to rely on alleged representations by Kasten that the work had been completed, since a person of ordinary prudence would have known that the roads and storm drains in "Phase II" had not been completed by merely checking the county records and by a visual site inspection; and,

in fact, that Rodriguez testified he learned from having "walked" the entire site that the work had not been completed.

For its first contention in this Court, Rod also says that the contract is "clear on its face," but that it should be construed to mean that it only imposed upon Rod the obligation "to apply the $45,000 to the completion of paving."

Alternatively, Rod urges that the "language creating an obligation to complete 'all' roads in the subdivision was ambiguous and required testimony to ascertain what roads were, in fact, intended by the parties." In this connection, it maintains that the assurances regarding the bond which had been posted by Kasten and the confirmation by Annapolis Federal—predicated upon one of the public works letters—that all "Phase II" paving had been completed, established that roads completed by Kasten before March 11, 1968 *or those which it had obligated itself to complete by its contract with the county* were excluded from the term "all" in the sales contract.

We need not dwell upon the various statements and representations allegedly made to Rod and the extent to which, if at all, it was entitled to rely upon them; nor upon any intention or understanding Mr. Rodriguez may have acquired from that information, since we are of the view that the sales contract, including the part in question, is clear and unambiguous, thereby making resort to extrinsic evidence unnecessary and improper. Nor, for the same reason, of course, are we required to deal with the myriad of legal issues that would follow from a consideration of that evidence.

As Rod states, both sides are "as one" in recognizing that the objective test for interpreting contracts is followed in Maryland, *U.S.I.F. Triangle v. Rockwood Dev. Co.*, 261 Md. 379, 275 A. 2d 487 (1971) ; *Sands v. Sands,* 252 Md. 137, 249 A. 2d 187 (1969) ; *Slice v. Carozza Properties, Inc.*, 215 Md. 357, 137 A. 2d 687 (1958) ; the application of this test limits the Court to the "four cor-

ners" of the contract in considering what the intention of the parties was, *Moore v. Modern Improvement Ass'n,* 190 Md. 39, 42, 57 A. 2d 316 (1948). This rule is especially apposite here in view of the integration clause in the contract.

In *Slice v. Carozza, supra,* Chief Judge Brune, speaking for the Court, said:

> "As we turn to the authorities, we may note first that the theory of 'objective law' of contracts has been almost universally adopted by this time. The written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding, or unless there is fraud, duress or mutual mistake. *Ray v. Eurice,* 201 Md. 115, 93 A. 2d 272. '* * * where there has been an integration of an agreement, those who executed it will not be allowed to place their own interpretation on what it means or was intended to mean. The test in such case is objective and not subjective.' " 215 Md. at 368.

The cardinal rule in the construction and interpretation of contracts is that effect must be given to the intention of the parties, unless it is inconsistent with some established principle of law, *Hardy v. Brookhart,* 259 Md. 317, 270 A. 2d 119 (1970) ; *Cadem v. Nanna,* 243 Md. 536, 221 A. 2d 703 (1966) ; *Schapiro v. Jefferson,* 203 Md. 372, 100 A. 2d 794 (1953). But, where a contract is plain and unambiguous, there is no room for construction, and it must be presumed that the parties meant what they expressed, *Little v. First Federated Life,* 267 Md. 1, 296 A. 2d 372 (1972) ; *Kermisch v. Savings Bank,* 266 Md. 557, 295 A. 2d 776 (1972) ; *Devereux v. Berger,* 253 Md. 264, 252 A. 2d 469 (1969). And, when

the language of a contract is clear, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant, *U.S.I.F. Triangle v. Rockwood Dev. Co., supra; Seldeen v. Canby,* 259 Md. 526, 270 A. 2d 485 (1970); *Katz v. Pratt Street Realty,* 257 Md. 103, 262 A. 2d 540 (1970). In addition to excluding Rod's "understanding" or "interpretation" as the test of what was intended under the contract, adherence to the latter principle also means that neither the "understanding" of Annapolis Federal nor that of the scrivener is a proper standard.

Unquestionably, the key to the interpretation of this contract is the construction of the word "all." In his opinion Judge Wray says that the word "all" is ambiguous, "but only because of the Department of Public Works' letters." But, as we have noted, the law of contracts, absent other considerations not here relevant, permits the use of extrinsic evidence only if the contract is ambiguous on its face. If it is not ambiguous, we may not look elsewhere. In this regard, the word "all" must be considered in its usual signification. In the construction of contracts, words are to be given their ordinary meaning, *Little v. First Federated Life, supra; Liller v. Logsdon,* 261 Md. 367, 275 A. 2d 469 (1971); *Coopersmith v. Isherwood,* 219 Md. 455, 150 A. 2d 243 (1959).

Surely, the words "completion of all paving" are not inherently uncertain; nor, apparently, was the trial judge of that opinion, having found the word "all" ambiguous "only because of the Department of Public Works' letters." To us, the meaning of the phrase is clear—the purchaser shall complete *all* paving in the subdivision, and not, as the trial judge ruled, paving other than "Phase II." This conclusion is reinforced, moreover, if we observe the rule that the intention of the parties must be garnered from the terms of the contract considered as a whole, and not from the clauses considered separately, *Perper v. Fayed,* 247 Md. 639, 234 A. 2d 144 (1967);

*Wheaton Lanes v. Rinaldi*, 236 Md. 525, 204 A. 2d 537 (1964) ; *Sagner v. Glenangus Farms*, 234 Md. 156, 198 A. 2d 277 (1964) ; *Walton v. Hospital Association*, 178 Md. 446, 13 A. 2d 627 (1940).

In applying the last-mentioned principle, we note that the contract called for settlement only nine days after its execution, which strikes us as being somewhat hurried for a contract of these dimensions. It also provided that Kasten was to "remove all its equipment from the premises within 24 hours after settlement."

The only obligation which remained for Kasten to perform after settlement under the express language of the contract was the responsibility for "grading, seeding, sidewalks, driveways which work" was to be done by Kasten for houses it was in the process of constructing when the contract was executed. In this regard, the contract was explicit in binding Kasten to completion, even to the extent that the sum of $15,000, which represented all but $512.02 of the total consideration to be received by Kasten in the sale and was to be evidenced by a 90-day note, was to be applied by Rod to the completion of any part of that work not finished within 90 days after settlement.

From all this emerges a clear intention that as of March 20, 1968, Rod was to effectively "take over" for Kasten and, without the loss of a stride, complete Winchester Estates; and this included any remaining "paving, etc." that required completion. The term "all" cannot be read to mean "only the work remaining after Phase II" without departing from the unambiguous language of the written contract. Expressions such as "Phase II" are not mentioned in the contract, and the Court may not, under the guise of construction, rewrite the contract made by the parties, *Compania De Astral v. Boston Metals Co.*, 205 Md. 237, 107 A. 2d 357, 49 A.L.R.2d 646 (1954).

If there is a trace of ambiguity in the disputed clause, it is the "etc." which follows the words "paving" and

"streets." Apart from Mr. Rodriguez's testimony that he knew this referred to storm drain work, Rod conceded that fact at oral argument before us. Thus, we treat the contract as one calling for completion of all street paving and storm drain work by Rod.

While our holding mandates a reversal of the judgment entered in favor of Rod and the entry of a judgment for Kasten, it does not entirely dispose of the case. Although Kasten presented evidence of its damages, that issue manifestly was not reached by Judge Wray, and for that reason, quite naturally, was neither briefed nor argued orally by the parties in this Court. In these circumstances, we shall remand the case for a determination of damages in the trial court.

*Judgment for costs reversed; judgment entered in favor of The Kasten Construction Company, Inc. against Rod Enterprises, Inc.; case remanded for a determination of damages; costs to be paid by appellee.*

*Murphy, C. J., dissenting:* -

Because I think that Rod's responsibility under the contract to complete ". . . all paving, etc. in regard the streets, etc. of the subdivision" was plainly limited to the $45,000 held in the escrow account, I must respectfully dissent from the view taken by the majority of the Court.

Judges Singley and Smith concur.