684 A.2d 32

**ST SYSTEMS CORPORATION**

v.

**MARYLAND NATIONAL BANK.**

**No. 1856, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Nov. 1, 1996.

Jeffrey W. King (Jeffrey L. Poston and King, Pagano & Harrison, on the brief), Washington, DC, for Appellant.

Ava Lias–Booker (Rebecca L. Dietz, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, Charles O. Monk, II and Weinberg & Green LLC, on the brief), Baltimore, for Appellee.

Argued before FISCHER and DAVIS, JJ., and JOHN J. BISHOP, Judge (Ret'd, specially assigned).

FISCHER, Judge.

ST Systems Corporation (STX) appeals from an order by the Circuit Court for Montgomery County that entered judgment in favor of Maryland National Bank (MNB). Specifically, the circuit court found: (1) that MNB did not breach contractual obligations with respect to the alleged Alternative Loan Agreement (ATL) and the 12/5 proposal, which increased STX's credit line to $12,000,000 and gave STX a $5,000,000 term loan; (2) MNB not liable for STX's tort claims; and (3) in favor of MNB's counter-claim based on the Interest Rate Protection Agreement (IRPA) in the amount of $278,893.13. STX raised the following questions, which we have condensed and reworded as follows:

I. Did the circuit court err by denying STX's request for a jury trial on its claims based on:

 a. the ATL

 b. torts stemming from the breach of the loan agreements

 c. the 12/5 proposal?

II. Did the circuit court err by finding for MNB with respect to the 12/5 proposal?

## FACTS

This case arises from a series of loan agreements between MNB, Equitable Bank, N.A. (Equitable), and STX. STX is a systems integration company incorporated in Maryland. Sharad Tak is STX's CEO and owns 71.8% of STX stock. In 1989, Mr. Tak solicited several banks in reference to negotiating a financing proposal to refinance both his and STX's preexisting financial obligations with National Bank of Washington (NBW).

STX and Mr. Tak received a two-stage financial proposal from Equitable that was similar to what STX and Mr. Tak had requested. First, Equitable promised to provide a $20,000,000 revolving line of credit, plus an additional $10,000,000 six month bridge loan to Mr. Tak so that he could repay NBW.

Second, Equitable promised to provide a $25,000,000 term loan to STX to fund an Employee Stock Ownership Plan (ESOP) that would purchase 30% of Mr. Tak's stock. Despite a series of commitment letters signed by the parties, they cancelled the arrangement because STX's plan to purchase another company was unsuccessful. STX and Equitable, however, continued to negotiate based on the financing structure of the original agreement and using reduced loan amounts to meet STX's financial needs.

On September 18, 1989, STX and Equitable executed a Loan and Security Agreement (LSA) that provided STX with a $7,000,000 revolving credit line and a commitment for a $15,000,000 ESOP loan. The ESOP loan was contingent on STX having a value of at least $40,000,000. On the same day, Mr. Tak executed a promissory note for the $10,000,000 six month bridge loan, whose proceeds were used to pay off Mr. Tak's $10,000,000 NBW loan.

MNB assumed control of STX's account when the merger between MNB and Equitable became final in January 1990. Craig Poms of MNB was assigned as the loan officer primarily in charge of STX's and Mr. Tak's loans. On January 25, 1990, at a meeting with Mr. Poms, Mr. Tak informed Mr. Poms that he had hired a company to perform a valuation of STX. Mr. Tak, however, did not inform Mr. Poms that Mr. Tak's company, Tak Communications, Inc. (Tak Com) had missed approximately $4,000,000 in interest payments on outstanding debt obligations.

In March 1990, STX was valued at between $28,000,000 and $33,000,000, thus falling below the required $40,000,000 figure necessary to secure the $15,000,000 ESOP loan. After the ESOP loan fell through, Mr. Tak and MNB began discussions on restructuring Mr. Tak's $10,000,000 personal loan. On April 3, 1990, Mr. Tak also informed Mr. Poms of an existing Makewell Agreement that made Mr. Tak personally liable for $3,000,000 if Tak Com defaulted on its loan payments. Mr. Tak, however, did not tell Mr. Poms that Tak Com was still in

payment default and that the payment of his $3,000,000 personal obligation had already been accelerated to March 1990.

In June 1990 the parties reached an agreement on restructuring STX's loans. MNB advanced the 12/5 proposal, which increased STX's credit line from $7,000,000 to $12,000,000 and gave STX a $5,000,000 term loan. STX would then lend, or by way of dividend, transfer $10,000,000 to Mr. Tak so he could pay his $10,000,000 personal liability, which was separate from his $3,000,000 liability under the Makewell Agreement.

MNB sent the 12/5 proposal to Mr. Tak, who signed the proposal letter on June 25, 1990. The 12/5 proposal was subject to the MNB loan committee's approval and any conditions that the loan committee placed on the loan. The loan committee approved the 12/5 proposal subject to several conditions. These conditions included, *inter alia,* that (1) Mr. Tak provide a $10,000,000 personal guaranty; (2) there be no material adverse change in Mr. Tak's or STX's financial condition as of April 1990; and (3) STX obtain at least $10,000,000 of interest rate protection by the loan closing date. Mr. Tak signed the proposal.

On August 27, 1990, after the parties drafted the closing documents, MNB sent Mr. Tak the revised guaranty agreement. On the next day, however, Mr. Tak called Mr. Poms and stated that he could not sign the revised agreement because of the Makewell Agreement. This is the first time that Mr. Poms or any other MNB loan official was informed of Mr. Tak's outstanding personal liability for Tak Com's default. On September 24, 1990, MNB withdrew the 12/5 proposal.

On March 30, 1992, STX, its principal shareholders, and senior employees (collectively the plaintiffs) filed suit against MNB in the circuit court. The complaint alleged that MNB breached two separate financing agreements; the ATL and the 12/5 proposal. The plaintiffs also filed eight tort claims based on MNB's conduct during the loan negotiation process.

MNB filed a motion to dismiss plaintiff's claims and to dismiss the claims of the individual plaintiffs. On June 22, 1993, the circuit court dismissed the claims of each individual

plaintiff, including Mr. Tak, but allowed STX to continue with its suit.

On July 14, 1993, MNB filed several pleadings with the circuit court. MNB answered STX's complaint and filed a counterclaim alleging that STX breached the IRPA that was part of the 12/5 proposal. MNB also asked the circuit court to deny STX's request for a jury trial. On September 28, 1993, after a hearing on the merits, the circuit court denied STX's request for a jury trial.

Between June 8, 1994, and June 30, 1994, the circuit court conducted a bench trial on STX's claims for: (1) breach of the ATL; (2) breach of the 12/5 proposal; (3) breach of the duty of good faith and fair dealing; (4) fraud in the inducement; (5) fraud in the performance; (6) tortious interference with prospective advantage; and (7) breach of fiduciary duty. Following STX's case in chief, the circuit court granted MNB's motion for a judgment dismissing STX's tort claims. On May 5, 1995, the circuit court, in a written opinion, found that MNB did not breach any contractual obligations and ruled for MNB on its counterclaim.

Following the circuit court's decision, STX filed this timely appeal.

## DISCUSSION

Our scope in reviewing the circuit court's findings is limited. Maryland Rule 8–131(c) reads as follows:

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

The clearly erroneous standard does not apply to questions of law or legal conclusions drawn from factual findings, which are afforded no deference. *Davis v. Davis,* 280 Md. 119, 124, 372 A.2d 231, *cert. denied,* 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d

299 (1977); *Van Wyk v. Fruitrade,* 98 Md.App. 662, 669, 635 A.2d 14 (1994).

## I.

STX argues that the circuit court erred when it denied STX's request for a jury trial on its claims against MNB. MNB counters that the circuit court correctly found that the LSA's jury waiver provision applied to the ATL, the 12/5 proposal, and the tort claims. MNB also asks this Court to find, independently of the circuit court, that the alleged ATL was not enforceable, thus rendering the jury waiver argument with respect to the ATL and the tort claims moot. Our discussion of the jury waiver issue bifurcates into statute of frauds and contractual interpretation issues.

### A. Section 5–317

The threshold question that needs to be addressed before this Court can apply the jury waiver provision to the ATL is whether the ATL is an enforceable oral agreement. If the ATL is not an enforceable agreement, as MNB argues in its brief, then the issue of whether the jury waiver provision applies is moot.

In 1989 the Maryland Legislature adopted a lenders liability provision which mandates that "a credit agreement is not enforceable by way of action or defense unless it: (1) Is in writing; (2) Expresses consideration; (3) Sets forth the relevant terms and conditions of the agreement; and (4) Is signed by the person against whom its enforcement is sought." Md. Code (1974, 1995 Repl.Vol., 1996 Supp.), § 5–317(b) of the Cts. & Jud.Proc. Art.[1] Section 5–317 defines a "credit agreement" as follows:

> (i) "Credit agreement" means a covenant, promise, undertaking, commitment, or agreement by a financial institution to

---

1. Unless otherwise specified, all statutory references in this opinion are to Md.Code (1974, 1995 Repl.Vol., 1996 Supp.), § 1–101, *et seq.,* of the Cts. & Jud.Proc. Art (CJ).

1. Lend money;

2. Forbear from repayment of money, goods, or things in action;

3. Forbear from collecting or exercising any right to collect a debt; or

4. Otherwise extend credit.

(ii) "Credit Agreement" includes agreeing to take or to not take certain actions by a financial institution in connection with an existing or prospective credit agreement.

Md.Code, CJ § 5–317(a)(2).

In this case, the facts clearly support a finding that the ATL failed to qualify as an enforceable agreement under section 5–317. There is nothing in the LSA that qualifies as or even makes reference to the existence of an ATL. Additionally, the loan documents prepared by Equitable are devoid of any reference to the existence of an ATL.

This Court is unable to find anything in the record that brings into question the circuit court's findings on the ATL. The circuit court made, *inter alia,* the following findings of fact:

> The alleged alternative term loan was not part of the July 12, 1989 proposal submitted by Equitable, nor was any reference to the alleged alternative term included in either the draft or the final August 7, 1989 commitment letter signed by Mr. Tak on behalf of STX.
>
> . . . .
>
> The Purported agreement to term out Mr. Tak's bridge loan also was not in any of the draft loan documents or any of the final loan documents signed by the parties on September 19, 1989. The very concept of an alternative term out would have been inconsistent with the terms expressly set forth in the loan documents.
>
> . . . .
>
> . . . The Court finds that the final August 7, 1989 commitment letter, signed and accepted by Mr. Tak, includes no references to an alternative term loan.

... Mr. Baker conceded at trial that he informed Mr. Tak that an alternative was lacking if the ESOP did not close, and that Mr. Tak was relying to his own detriment on alleged oral statements made by Stacia McGinn.

STX insists that two internal memoranda written by MNB loan officer Ms. McGinn demonstrate that the parties contemplated an ATL and therefore, satisfy section 5–317. This argument, however, is not convincing. McGinn wrote two memoranda discussing various alternatives to the ESOP loan. These two memoranda, however, were never incorporated into the terms of the approved agreements. Testimony at trial revealed that these memoranda were nothing more than background material intended to brief loan officers on all available financial options.

STX's argument that the memoranda were binding also fails because Ms. McGinn lacked actual or apparent authority to bind MNB to the ATL. Every loan proposal had to be approved by the loan committee. In this case, the loan committee never approved any loan proposals that contained any reference to the ATL or any other alternative loan arrangement. Accordingly, the mere fact that reference to an ATL appeared in two internal bank memoranda does not satisfy section 5–317.[2]

■ STX insists that the issue of whether a contract existed is a factual question that needs to be answered by a jury. The determination of whether something is enforceable under section 5–317 and whether a contract existed are, however, two distinct issues. Compliance with section 5–317 would only become a jury question if the material facts, which if believed

---

2. In its brief, STX also argued that notes taken by its general counsel, Mr. Baker, during a telephone conversation with Andrew Paalborg, an Equitable loan officer, prove that the parties contemplated including an ATL. This argument fails for two reasons. These alleged notes do not qualify as an enforceable agreement under section 5–317. Additionally, the alleged references to an ATL were not included in subsequent commitment letters sent by Mr. Paalborg to Mr. Baker. Because the references to the ATL were not included, the notes themselves cannot qualify as enforceable.

would support a finding of compliance, are in dispute. *See Kerner v. Eastern Dispensary and Casualty Hospital*, 214 Md. 375, 382, 135 A.2d 303 (1957) (noting that under the statute of frauds a dispute as to material facts is an issue for the jury). In the case *sub judice*, enforceability under section 5–317 remained a threshold legal determination that did not involve a jury finding because there are no facts in the record that evince compliance with section 5–317.

## B. The Tort Claims

■ The issue of whether section 5–317 applies to tort claims based on an unenforceable plan has not been discussed by a Maryland appellate court.[3] The issue has been addressed by many states that have adopted lender liability statutes, but these out of state decisions have no precedential value before this Court and are therefore simply legal indicia that clarify the novel issue in this case.

Lender liability provisions, such as section 5–317, are intended to limit the increase in lender liability litigation. *Howard Oaks, Inc. v. Maryland Nat'l Bank*, 810 F.Supp. 674, 676–677 (D.Md.1993); *see also* Todd C. Pearson, Note, *Limiting Lender Liability: The Trend Toward Written Credit Agreement Statutes*, 76 Minn.L.Rev. 295, 296–299 (1991) (discussing the adoption of lender liability statutes in thirty three states). Section 5–317 has broad language that appears to incorporate an expansive view of limiting lender liability by conditioning the enforcement of a credit agreement on the fulfillment of four conditions precedent.

The Floor Report for then House Bill 704, which became section 5–317 when adopted, supports this expansively protective approach. The Floor Report reads, in part, as follows:

---

3. STX points out that in *Maryland Nat'l Bank v. Quince Diamond Ltd. Partnership*, Nos. 76454 and 76455 (October 28, 1991, Messitte, J.), the Montgomery County Circuit Court, in a written opinion, decided not to apply section 5–317 so as to prevent tort claims from going forward. STX then argues that MNB is asking "this Court to overturn the *Quince Diamond* precedent...." Simply put, *Quince Diamond* has no precedential value before this Court.

In recent years, the banking industry has faced an increasing number of lender liability lawsuits. In some cases, judgments have ranged into the hundreds of millions of dollars. This bill will protect lenders against claims that the lender made a verbal promise to loan money and then refused to do so, or that the lender verbally agreed to extend the terms of a loan.

Senate Judicial Proceedings Committee, H.B. 704, 1989 General Assembly of Maryland Floor Report. Although legislative history can sometimes be manipulated to support a desired result, *cf. Gaskins v. Marshall Craft*, 110 Md.App. 705, 712, 678 A.2d 615 (1996) (noting that determining congressional intent can often result in a finding of judicial intent rather than congressional intent), the House Floor report is consistent with the basic economic premise underlying lender liability statutes.

■ Under the rules of construction, courts must interpret statutory language so as to advance the legislative policy behind the statute. *Rose v. Fox Pool Corp.*, 335 Md. 351, 358–359, 643 A.2d 906 (1994); *Baltimore County Coalition Against Unfair Taxes v. Baltimore County*, 321 Md. 184, 203, 582 A.2d 510 (1990). In the case *sub judice*, section 5–317's economic protective policy is *only* upheld if tort claims based on an unenforceable alleged agreement are excluded.

■ Allowing enforcement of tort claims based on an unenforceable oral agreement would invalidate section 5–317 by nullifying its protective purpose. Subjecting lenders to expensive tort claims would allow parties to avoid section 5–317's protective reach, thereby rendering section 5–317 merely a symbolic shell without any real effect. We, however, refuse to invalidate a properly enacted statute by adopting an interpretation devoid of any legal or practical support. *See State Dep't of Assessments and Taxation v. Belcher*, 315 Md. 111,

119, 553 A.2d 691 (1989) (stating that the rules of construction should not be used to frustrate a legislative objective).[4]

■ The legislature could have limited the protective reach of section 5–317 by specifically allowing tort claims based on unenforceable agreements to go forward. The legislature, however, did not include such a provision. Accordingly, we are not permitted to rewrite judicially a statute in order to create a provision that the legislature did not intend. *See Department of Motor Vehicles v. Greyhound Corp.*, 247 Md. 662, 668, 234 A.2d 255 (1967).

### C. The LSA's Jury Waiver Provision

■ STX argues that the circuit court erred when it found that the LSA's jury waiver provision applied to the 12/5 proposal and the IRPA. MNB counters that the jury waiver provision is valid and applies to the 12/5 proposal and IRPA.

Section 9.11 of the LSA reads as follows:

*Waiver of Jury Trial.* Borrower and Bank hereby waive, to the extent permitted by law, trial by jury in any litigation between Bank and Borrower arising out of the Loan Documents and the transactions contemplated.

Section 1.1 of the LSA defines "Loan Documents" as:

[T]he Revolving Credit Note, Term Note, this Agreement and any other agreement or document referred to herein or now or hereafter delivered in connection with the transactions contemplated hereby, together with any and all revisions, amendments and modifications to, replacements of and substitutions for, any of the foregoing.

Similar language appears in the "Amended and Restated Loan Security Agreement" that was prepared for the closing of the

---

4. *Arguendo,* even if section 5–317 does not bar STX's tort claims, the jury waiver provision, as discussed in sub-section C *infra*, would still apply. The tort claims are based on the loan documents and thereby would qualify as "arising out of Loan Documents and transactions contemplated."

12/5 loan.[5]

 Even though the right to a jury trial is fundamental, Md.Declaration of Rights Art. 23, parties can contractually waive their right to a jury trial. Generally, jury waiver provisions are strictly construed. 5 *Moore's Federal Practice* § 38.46, at 38–428 (2d ed. 1993). The rules of construction, however, cannot be used to limit artificially the scope of a jury waiver provision in contrast to the language used by the parties in the contract itself.[6] We, therefore, see no reason why our interpretation of contractual jury waiver provisions should differ from the established construction rules used for interpreting contracts.

 This Court's duty is to interpret the language of the contract and determine what a reasonable person in the parties' position would have meant by the language used in the contract. *Jenkins v. Karlton*, 329 Md. 510, 525, 620 A.2d 894 (1993); *General Motors Acceptance v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306 (1985). Additionally, words within a contract are afforded their ordinary meaning unless otherwise specified. *Kasten Const. v. Rod Enterprises*, 268 Md. 318,

---

5. Section 9.12 of the Amended and Revised LSA provides, in part, the following jury waiver provision:

 To the fullest extent permitted by the laws of the State of Maryland, Borrower hereby waives trial by jury in any action proceeding to which Borrower may be party, arising out of or in any way pertaining to this Agreement, the Notes, any of the Loan Documents, or the Collateral. This waiver constitutes a waiver of trial by jury of all claims against all parties to such actions or proceedings, including claims against all parties who are not parties to this Agreement. . . .

6. Some courts apply a presumption against enforcing contractual jury waiver provisions. *E.g.*, *National Equipment Rental, Ltd. v. Hendrix*, 565 F.2d 255, 258 (2d Cir.1977). There are also courts that apply a presumption in favor of upholding contractual waiver provisions. *E.g.*, *K.M.C. Co., Inc. v. Irving Trust Co.*, 757 F.2d 752, 756–757 (6th Cir.1985). These presumptions, however, have less to do with the actual interpretation of a jury waiver provision and more to do with who has the burden of proving that the waiver was knowing and intelligent. In this case, there are no facts in the record to support an allegation that the jury waiver provision was not entered into knowingly and intelligently.

329–330, 301 A.2d 12 (1973); *Strickler Eng. Corp. v. Seminar,* 210 Md. 93, 100, 122 A.2d 563 (1956).

In this case, the LSA's waiver provision applies to the 12/5 proposal. The 12/5 loan was a modification of the original loan agreement. Testimony at trial revealed that the 12/5 proposal was an effort to restructure the original LSA. Additionally, the "Amended and Restated Loan and Security Agreement," which was prepared for the 12/5 proposal, included a jury waiver provision similar to the one in the original LSA. The inclusion of a revised LSA, based in part on the original LSA, not only demonstrates that the parties intended for a jury waiver provision to apply but also that the 12/5 proposal was born out of the original loan proposal.

With respect to the IRPA, it was part of the 12/5 proposal. Additionally, there is nothing within the 12/5 proposal itself, the LSA, or any other loan documents that indicates that the parties intended the IRPA to be a separate agreement. Accordingly, the jury waiver provision applies to the IRPA as well.

## II.

STX argues that the circuit court erred by finding that MNB did not breach the 12/5 agreement by withdrawing the proposal before closing. Specifically, STX insists that MNB used the attorney-client privilege to hide the reasons that it chose to withdraw the proposal and, thus, the advice of counsel was at issue. MNB counters that it had a valid reason for withdrawing the proposal and that the attorney-client privilege question is not an issue in this appeal.

A party waives his attorney-client privilege when the party relies on the advice of counsel as an element of his defense. *Fraidin v. Weitzman,* 93 Md.App. 168, 227, 611 A.2d 1046 (1992), *cert. denied,* 329 Md. 109, 617 A.2d 1055 (1993). In other words, the client cannot use the advice of counsel as a sword to prove his case but then assert the privilege as a shield to prevent disclosing harmful information.

In this case, MNB's reason for withdrawing the 12/5 proposal was not based on advice of counsel but the failure of STX and Mr. Tak to comply with the 12/5 proposal. In finding no factual support for STX's breach of contract claim, the circuit court concluded that

[t]he proposal could not proceed to closing because Mr. Tak could not sign the guaranty, a condition required prior to closing. Moreover, Mr. Tak's personal financial condition had significantly deteriorated, thus making real the Bank's previous concerns of fraudulent conveyance and voidable preferences issues. Finally, STX made clear after it withdrew the proposal that it would not assume Mr. Tak's personal obligation.

One MNB witness, Mr. Poms, did mention that "a lot of the reasons that we [MNB] withdrew this proposal at this time and some of the reasons for it were on advice of counsel...." This statement, however, was not an attempt to hide the reasons that MNB decided to withdraw the 12/5 proposal. In fact, Mr. Poms testified, in response to a question on why the bank withdrew the 12/5 proposal, that

[t]he 12/5 proposal had a particular structure to it, as we have discussed. The acceleration of the makewell posed some very negative relevant credit factors on the financial condition of Mr. Tak, and it was an examination of those issues that led us to withdraw that, to not want to continue with that proposal and therefore to withdraw that proposal.

In this case, the attorney-client issue is nothing more than a smoke screen intended to blur our judicial vision and take us off our adjudicatory path. The reasons MNB chose to reject the 12/5 proposal are in the record and were testified to at trial. At no point, either in discovery or during the trial, were STX's efforts to question MNB officials prejudiced because MNB officials evoked their attorney-client privilege.

For the aforegoing reasons, we affirm the decision of the circuit court.

JUDGMENT AFFIRMED.

APPELLANT TO PAY COSTS.