HUBBARD'S PIER AND SEAFOOD, INC. ET AL. *v.*
ROCK HALL CLAM & OYSTER CO. ET AL.

[No. 468, September Term, 1973.]

*Decided March 13, 1974.*

438

The cause was argued before ORTH, C. J., and MORTON and THOMPSON, JJ.

*Elroy G. Boyer* for appellants.

*A. Parks Rasin, Jr.,* for appellees.

ORTH, C. J., delivered the opinion of the Court.

Whether Hubbard's Pier and Seafood, Inc. and Albert W. Woodfield (Lessors) or Rock Hall Clam & Oyster Co., Inc., Peter John Markos, Euripedes John Markos, and Evangelos John Markos (Lessees) are entitled to $1605 being held by the Department of Natural Resources of the State of Maryland depends upon the construction given a clause in a lease drafted by Lessors' attorney and executed on 7 May 1965.[1] The clause, paragraph 3, reads:

---

1. On 7 May 1965 Edna Marie Hubbard leased certain premises on the shore of Rock Hall Creek and the north side of Sharp Street in Rock Hall, Maryland to Peter John Markos, trading as Rock Hall Clam and Oyster Company. The lease was for a term of one year with renewal provisions until 5 May 1968 when it was to "automatically terminate." On 17 August 1967 an "Extension of Lease" was executed by the then owners of the premises, Hubbard's Pier and Seafood, Inc. and Albert W. Woodfield, as lessors, and Rock Hall Clam & Oyster Co., Inc. Peter John Markos, Euripedes John Markos and Evangelos John Markos, as lessees, the extension document stating that "* * * there has been a change of ownership in the real estate described since the date of said Lease, and also a change in the corporate ownership of the Lessee therein * * *." Under the extension agreement the original lease in all its terms (except the amount of rent) was extended for five years to 5 May 1973 with the privilege granted to the lessees to extend it for an additional term of five years to 5 May 1978. Provisions relating to extension and cancellation were set out, but, it was provided that in any event "* * * this Extension of Lease shall automatically terminate and become null and void on May 5, 1978."

"It is mutually agreed that any oyster shells resulting from the Lessee's oyster operation will belong to the Lessor herein, subject, however, to the necessary share legally allowed by law to the Tidewater Fisheries."

The $1605 represents 16,050 bushels of oyster shells sold by Lessees to the State of Maryland at 10 cents a bushel.

Lessees sought declaratory relief in the Circuit Court for Kent County. Courts Art. § 3-406. That court determined that Lessees were entitled to the money and issued an appropriate order on 22 June 1973. Lessors appealed therefrom. Courts Art. § 12-301 and § 12-308 (a) (14).

I

The premises subject to the lease were carefully delineated:

"This lease and the terms thereof shall be confined to the entire first floor and all the equipment contained therein of the building now being utilized as a clam and oyster shucking operation, with the right reserved to the Lessor to enter at all times for inspection and for free and unlimited access to the furnace or other machinery for operation or repairs.

This Lease shall in no way vest in the Lessee any interest in the restaurant building, the second floor over the oyster and clam operations, or any of the waterfront property, except that the Lessee is hereby granted the privilege of enough room to unload his clam and oyster boats at all times, so long as such loading or unloading does not unreasonably interfere with any business operations of the Lessor.

The Lessee is also granted the privilege of using so much of the grounds in the real estate described above as shall be needed for storage of oyster shells or trucking operations, but such space shall be confined to an area designated by the Lessor. It is

further mutually agreed that the area hereby leased as to ground space shall be mutually and jointly used by both the Lessor and the Lessee, so long as the Lessor's operations do not conflict nor interfere with the Lessee's oyster or clam operation. Lessee agrees to remove and dispose of clam shells from the premises as used."

A subsequent clause, paragraph 9, provided: "Lessor agrees to allow Lessee the right to use waterfront property designated by the parties directly behind leased premises."

The permissible use of the demised premises was spelled out:

"Lessor agrees to allow Lessee to use leased premises in the business buying, selling, shucking and processing clams and oysters, retail as well as wholesale, and to perform all acts incident to such business. Lessee agrees not to sell either retail or wholesale for less than Lessor. Lessee reserves right to sell to dealer at own price set by Lessee. A dealer shall not include any fishing party boat or any purchase less than five bushel or equivalent thereof in any lump sum sale. No resale of any clam or oyster shall be allowed on the leased premises."

There were additional express covenants concerning the operation of the business. Paragraph 6 provided:

"The Lessee further agrees that its business operations on the premises shall be restricted solely to clams and oyster, and at no time will it deal in the retail or wholesale trade of fish, crabs or other seafood. It is agreed that the Lessor may also sell oysters and clams, either wholesale or retail, but must purchase from the Lessee any clams to be resold after a 15% mark up to be paid to the Lessee on the price which the Lessee must purchase. It is further agreed that should the Lessee be unable to furnish or supply clams to the Lessor, then the Lessor may buy or obtain clams elsewhere."

Paragraph 7 prescribed:

"It is specifically agreed that the Lessee will not enter into the sale of any gasoline, oil or other fuel to any person, but that as part of the consideration of this Lease it is agreed that the Lessee will encourage and stress that clammers with whom the Lessee deals will purchase gasoline and other supplies from the Lessor and no place else."

For the initial term of the lease the rent was $4800. For any renewal term under the original lease the yearly rent was $5000. Under the extension agreement the rent was $4000 a year.

## II

Evidence adduced at the trial through the testimony of James J. Marcus,[2] General Manager and Executive Vice President of Rock Hall Clam & Oyster Co., Inc., in behalf of Lessees, and Albert W. Woodfield, President of Hubbard's Pier and Seafood, Inc., in behalf of Lessors, showed that Lessees conducted their oyster operation on the demised premises (the Sharp Street plant) until sometime in January 1971, during the 1970-1971 oyster season, when the operation was moved to a plant, a short distance away, built by Lessees (the Chesapeake Avenue plant). The practice initially followed under the lease was that the shells were stored on the demised property until picked up by the State which paid Lessors for the shells purchased by it. There came a time, however, when "a town ordinance was passed" prohibiting the storage of oyster shells within the limits of Rock Hall. Lessors then made arrangements with the County to store the shells on the county dump. The shells resulting from the Lessees' oyster operation on the demised premises were thereafter loaded by Lessors on Lessors' trucks by means of Lessors' conveyor and hauled to the county dump where they were picked up by the State which paid Lessors for the shells purchased. When Lessees moved

---

2. As spelled in the transcript of the proceedings.

their oyster operation to the Chesapeake Avenue plant the practice changed. Lessees loaded and hauled the shells to the dump. Marcus said this was done entirely with Lessees' equipment except for a period of four days when their truck was broken. During that period Lessors' truck was used, for which Lessees paid Lessors a daily rental of $5. Woodfield said that during January 1971 Lessors' conveyor was used to load the truck because Lessees' conveyor was too short for the job. In any event, Lessors continued to receive the proceeds of the sale to the State of the shells resulting from Lessees' oyster operation during the 1970-1971 season. Marcus explained why Lessees made no claim to them: "Because we had piled them all in the same pile that we had piled the '70 oyster shells in and we just left them all together. * * * Because they were all stored at the County Dump and they were all in one pile and there was no way we could separate them, so we just let them go." Lessees, however, expected to obtain the proceeds from the sale of the shells to the State for the 1971-1972 season. Marcus said that all the Lessees' oyster operation during that season was conducted at their Chesapeake Avenue plant, and he first learned that Lessors were claiming the proceeds of the sale of the shells when he called the Department of Natural Resources in July or August 1972 and was so informed.[3]

The issue was joined. Lessees claimed that Lessors were entitled only to those oyster shells which resulted from Lessees' operation conducted on the demised premises. Lessors contended that they were entitled to the oyster shells which resulted from Lessees' oyster operation no matter where conducted, whether on the demised premises or any other place in Rock Hall, or Kent County, or the State of Maryland, or any other state.

### III

The basic law is clear. "Maryland contract law is to the effect that where a contract is plain as to its meaning, there is no room for construction and it must be presumed that

---

3. It was established that the lease was legally terminated 6 May 1973, and the keys to the premises returned to Lessors.

the parties meant what they expressed." *Kermisch v. Savings Bank of Baltimore,* 266 Md. 557, 559-560.[4] The Court of Appeals follows the general rule: "The standard of interpretation of an integration, except where it produces an ambiguous result, or is excluded by a rule of law establishing a definite meaning, is the meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended it to mean." *Weber v. Crown Central Petroleum Corporation,* 214 Md. 115, 120, quoting *Restatement,* Contracts, § 230. It quoted, at 121, with approval 3 *Williston, Contracts* (Rev. ed.), § 613, p. 1763:

> "It is often said that direct evidence of intention is admissible in case of equivocation * * *. But it should be observed that it is not primarily the intention of the parties which the court is seeking, but the meaning of the words at the time and place when they were used. The fact that the parties intended their words to bear a certain meaning would be immaterial were it not for the fact that the words either normally or locally might properly bear such meaning, and this is the basis of the rule in regard to equivocation." [5]

### IV

The crux of the case is whether, under the mutual agreement set out in paragraph 3 of the lease, only those oyster shells which result from Lessees' oyster operation on the demised premises belong to Lessors, or whether Lessors

---

**4.** There was no attempt here to show fraud, duress or mistake so as to offer, as indication of intention, parole evidence of conversations made before or at the time of the integration of the contract into writing. See *Foreman v. Melrod,* 257 Md. 435.

**5.** The parties here do not suggest that the terms of the lease were modified by their subsequent conduct or that there was any subsequent oral modification of them. See *Hoffman v. Glock,* 20 Md. App. 284. They rely on the terms of the lease.

are entitled to the oyster shells resulting from any oyster operation of Lessees no matter where conducted.[6]

The words of the lease and extension agreement, even when read in the light of the surrounding circumstances, cannot fairly be said to have a double meaning. We see no equivocation. Therefore, we must look to the words of the written documents, presuming that the parties meant what they expressed.[7]

---

6. Lessors present the question:

"Were not the proceeds from the oyster shells anticipated by the parties to be part of the rent and did not the trial court commit error in ruling that such proceeds should be paid to the appellees? "

Lessees phrase it differently:

"Whether the lease agreement between the parties, awarding to the Lessor the proceeds from the sale of oyster shells resulting from Lessee's oyster operation, covered only the proceeds from the sale of oyster shells derived from the demised premises described in the lease, or whether it encompassed also the proceeds from the sale of oyster shells derived from another oyster-shucking plant that was owned and operated by Lessee at a different location? "

7. The trial court found no evidence "* * * of any inequity involved in the removal, [of the oyster operation to the Chesapeake Avenue plant] such as a fraudulent device to escape from the lease." There was no attempt by either side to determine directly the reason why Lessees built a new plant and moved their Rock Hall oyster operation to it. Woodfield, testifying about his purchase of the demised property, said: "The only reason that I was willing to negotiate on a lease with P. J. Marcus Company was because they were getting about 75 to 85% of the clams to start with, so I went along with leasing the property plant, the oyster and clam shucking plant, to the P. J. Marcus Company at a price which I thought I could get a decent return on my investment. The clams that came in there, some were shucked and some went out by bushels to Ipswich, Massachusetts. We had a truck that was purchased, that was purchased by me at that time, and he had a driver — Hubbard's Pier and Seafood had a driver, that had been hauling to Ipswich, Massachusetts for many, many years." Twice during the course of his testimony he attempted to explain his motive in reducing the rent. The first time, objection was sustained, the court opining that the point was not before it. "That is the lease into which he entered and it speaks for itself, and the objection is sustained." The second time occurred when he was asked the location of the Chesapeake Avenue plant in relation to the Sharp Street plant. The transcript reads:

"It is just around the corner, and had it not been for us recovering the oyster shells they would never have leased the property for the operation for $4,000. We had intended on receiving at least $5,000 and because of the amount of money we were getting from the shells which were paid for by the State we were able to make the reduction to $4,000, plus anything from $1500 to $2000 we were getting from these oyster shells. If I had not received that money I would need to get more money for it, from the lease. The Town passed an ordinance which stated we could no longer store the shells on the premises, so —

The court below found: "[I]t is quite obvious that the lease comprehended nothing beyond the immediate facility." We agree. We are led to this conclusion from the words used throughout the lease. We think it patent that they concern only the leased premises and the conduct of the Lessees and Lessors with regard thereto. In the delineation of the premises covered by the lease the privilege granted Lessees of enough room on the waterfront to unload their clam and oyster boats clearly referred only to clams and oysters for the operation conducted on the premises. The provisions for Lessee to use "so much of the grounds in the real estate described above as shall be needed for storage of oyster shells or trucking operations", patently contemplated no more than the operation on the premises. So also with Lessees' agreement "to remove and dispose of clam shells from the premises as used." The lease spelled out the permissible use of the premises as "the business of buying, selling, shucking and processing clams and oysters, retail as well as wholesale, and to perform all acts incident to such business," that is the business conducted on the premises. The agreement by Lessees immediately following that agreement of Lessors as to the use of the premises, that they agree not to sell either retail or wholesale for less than Lessors, with a reservation by Lessee to sell to a dealer "at own price set by Lessee," with "no resale of any clam or oyster" being "allowed on the leased premises," patently referred only to the oyster and clam operation with respect

---

Mr. Rasin [Counsel for Lessees]: I object, Your Honor, now he is trying to get into —

Judge Wise: I will sustain the objection. I don't see the relevance Senator Boyer. I can appreciate Mr. Woodfield's concern of getting into the ordinance if he had jurisdiction, but as a legal matter I don't regard it as important.

Q: That's alright. I was going to stop him, but —

Judge Wise: That's alright. I understand."

Whether the objection as made and sustained went to the entire testimony about the rent reduction or only to the matter of the ordinance is not clear. As indicated above, however, the court had previously sustained an objection to evidence attempting to explain why Lessors reduced the rent. In any event, as we find the contract to be plain and unambiguous, there is no room for construction, and the intention of the parties as distinguished from the meaning of the words used, is immaterial.

to the premises. The agreement that Lessors "may also sell oysters and clams, either wholesale or retail (they being adjacent competitors), but must purchase from the Lessee any clams to be resold after a 15% mark up to be paid to the Lessee on the price which the Lessee must purchase," led the court below to ask categorically in its opinion and order: "Could this mean that the [Lessors] would be bound to buy all their clams from the [Lessees] irrespective of where or how many outlets the [Lessors] might choose to have? " It is equally apparent that the specific agreement of paragraph 7 of the lease that Lessees would not sell gasoline, oil or other fuel to any person, and their agreement to "encourage and stress" that clammers with whom they deal "will purchase gasoline and other supplies from the Lessor and no place else" related only to Lessees' operation on the leased premises and did not contemplate their business conducted elsewhere, for example, in Massachusetts. The court below found, as we find, "innumerable instances where the lease could only be applicable to this particular demise and no other."

The short of it is, we think it plain that when Lessors and Lessees mutually agreed that any oyster shells resulting from Lessees' oyster operation "will belong" to Lessors, they contemplated only the Lessees' oyster operation conducted on the demised premises.

This conclusion, however, does not end the inquiry. It was not disputed, and the trial court found from the evidence, that Lessees abandoned the oyster operation conducted on the demised premises in January 1971, when they removed the operation to their own building. We see nothing in the lease to preclude Lessees from following this course of action. We first note that it was provided that "any oyster shells resulting from the Lessees' oyster operation" (subject to the legal share of the State) belong to Lessors. We think "any" as therein used may fairly be construed as a function word to indicate what is considered despite its quantity or extent. See Webster's Third New International Dictionary (1968). Thus, the clause did not necessarily contemplate that there would be oyster shells, but indicated that if there

were, they would belong to Lessors. Nowhere in the lease was there an obligation on the part of Lessees to carry on an oyster operation. Such obligation did not appear as a matter on which there was mutual agreement or to which Lessees agreed, although mutual covenants and agreements and Lessees' covenants and agreements were carefully spelled out. Lessors agreed to allow Lessees to use the demised premises for oyster operation, and Lessees agreed that their business operations on the premises "shall be restricted solely to clams and oysters." It is clear that Lessees were free to carry on an oyster operation but were not obliged to do so.

Detailed provisions were made in the lease for the amount of rent:

"The term of this Lease shall be for a one year period beginning May 6, 1965 and running to May 5, 1966, and for which the Lessee agrees specifically to pay the sum of Three Thousand Six Hundred Dollars ($3,600.00) per annum, payable in equal monthly installments of Three Hundred Dollars ($300.00) each and every month payable in advance, and the Lessor agrees in addition to the payment by the Lessee aforesaid, to contribute the sum of One Thousand Two Hundred Dollars ($1,200.00) for the year term of this Lease, which said One Thousand Two Hundred Dollars ($1,200.00) shall be deducted from an open account now due the Lessee to the Lessor. The payment of Three Thousand Six Hundred Dollars ($3,600.00) by the Lessee and One Thousand Two Hundred Dollars ($1,200.00) by the Lessor, will make an annual rental of Four Thousand Eight Hundred Dollars ($4,800.00) due and payable under this Lease. Specific provision is hereby made by the Lessor to the Lessee to renew this Lease and all the terms and conditions thereof, except that the annual rent under such extension shall be for Five Thousand Dollars ($5,000.00) per annum, payable in equal monthly installments, all of which shall be due and payable by said Lessee

with no contribution thereof to be made by the Lessor, and that such extension shall be for an additional two year period after May 5, 1966, unless intention to terminate shall be given by said Lessee in writing on or before April 1, 1966. If no such notice of termination is given, then this Lease shall automatically renew itself as aforesaid for an additional two year term and shall then automatically terminate on May 5, 1968."

The extension agreement, which declared that all other terms and conditions set forth in the lease "shall remain in full force and effect and binding on all parties hereto the same as provided for in the original Lease," provided with respect to the amount of rent:

"And for which the Rock Hall Clam & Oyster Co., Inc. and Peter John Markos, Euripedes John Markos and Evangelos John Markos, agree specifically to pay the sum of Four Thousand Dollars ($4,000.00) per annum, in equal monthly installments of Three Hundred Thirty-three Dollars and Thirty-three Cents ($333.33) each and every month, payable in advance."

If it was the intention of the parties that the sale of the oyster shells by Lessors was of real significance in the amount of rent agreed to be paid, it was not explicit or implicit in the lease. Nothing, in fact, was said about the sale of the oyster shells. It may have been, as far as can be ascertained from the lease, that Lessors had other use for the shells than the sale of them. Even if the covenant as to the oyster shells be considered a remuneration in kind to Lessors by way of rent, it would, as the trial court pointed out in its opinion, "necessarily * * * be contingent upon acts of God and the sovereign, as well as the decisions of the [Lessees], *i.e.,* a poor catch, contamination of the waters, discontinuance of oyster operations altogether. In short, the [Lessors] were clearly taking a gamble of whether or not there would be any such supplemental remuneration at all." The court concluded:

"A short answer to the whole dispute is that, if the Defendants intended otherwise, they should have included a provision for a guaranteed remuneration from this source or a penalty for abandonment or removal by the Plaintiffs of their oyster operation. The Court cannot make the contract for the parties and 'the true test of what was meant is not what a party to the contract may have intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.' Triangle Towers v. Rockwood Dev. Co., 261 Md. 379."

We share this view. We think that a reasonable person in the position of the parties here would have thought that the disputed clause meant only that oyster shells, if any, resulting from Lessees' oyster operation on the premises, belonged to Lessors.[8]

In the light of our holding, we do not reach matters posed by appellants' second question.[9] We do not determine whether the trial judge did refuse to consider evidence with regard to the proceeds of the oyster shells being part of the rental, see note 7, *supra*, or whether, if he did so refuse, he erred.[10]

*Judgment affirmed; appellant to pay costs.*

---

8. Even if we felt an ambiguity existed, we would reach the same conclusion. There is another rule of construction of contracts which has been often restated by the Court of Appeals and which it has said it cannot disregard: "[W]here an ambiguity exists, a contract will be most strongly construed against the one who prepared it." *Kelley Construction Company, Inc. v. Washington Suburban Sanitary Commission,* 247 Md. 241, 250. See *St. Paul at Chase Corporation v. The Manufacturers Life Insurance Company,* 262 Md. 192, 221. And there is also the general rule that a lease must be construed most strongly against a lessor and in favor of a lessee, which is resorted to when the words of the instrument are doubtful in their meaning or susceptible to more than one construction. *Standard Garments Co., Inc. v. Hoffman,* 199 Md. 42, 47. The lease here was prepared by Lessors' attorney.

9. "If in fact the proceeds from the oyster shells did constitute part of the rental, did not the trial court commit error in refusing to consider the evidence presented on that point? "

10. We note, however, that the evidence offered on the point, went not to a mutual agreement of the parties, but to the subjective motive of Woodfield in reducing the amount of rent when the term of the lease was extended.