DELMARVA DRILLING COMPANY, INC. *v.*
TUCKAHOE SHOPPING CENTER, INC.

\* \* \*

TUCKAHOE SHOPPING CENTER, INC. *v.*
DEAN ET AL.

[No. 192, September Term, 1972.]

*Decided March 28, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, SINGLEY, SMITH and LEVINE, JJ.

*Philip E. Nuttle, Jr.,* with whom were *Roland C. Kent* and *Brown & Nuttle* on the brief, for Delmarva Drilling Company, Inc.

*J. Owen Wise* for Tuckahoe Shopping Center, Inc.

*Charles W. Collett,* with whom was *Z. H. Stafford* on the brief, for Howard Aldy Dean, Jr. et al.

LEVINE, J., delivered the opinion of the Court.

These are two appeals: One is brought by Tuckahoe Shopping Center, Inc. (Tuckahoe) from a money judgment entered against it in favor of Howard Aldy Dean, Jr. and Lillian Marie Dean (the Deans). This resulted from a claim under a lease agreement in which Tuckahoe was the lessor and the Deans were the lessees. Delmarva Drilling Company, Inc. (Delmarva) brings the second appeal from a judgment entered against it pursuant to a third-party claim which Tuckahoe had brought for recovery of any judgment that might be entered against it in favor of the Deans.

This case undoubtedly adds a new dimension to the statement that: "This business will never hold water." [1] It all began about May 31, 1968, when, with a view

---

1. Colley Cibber, *She Wou'd and She Wou'd Not,* Act IV (1703).

towards operating a new coin laundromat, the Deans entered into a lease agreement with Tuckahoe which agreed to rent certain premises for that purpose in the shopping center it was preparing to construct on Maryland Route 404 near Hillsboro. Among the provisions contained in the lease was the following:

> "In addition to all rentals herein specified, Tenant shall pay for all utilities, used or consumed in or upon the demised premises, except that the Landlord *shall furnish water to* the Tenant for the sum of Twenty ($20.00) Dollars per month." (emphasis added).

Pursuant to that obligation, Tuckahoe entered into a written agreement on August 9, 1968 with Delmarva for a well to be dug near the leased premises. While in one part of the agreement it was specified that the price was to be "$400.00 for 50 ft., plus $4.00 per foot for additional depth over 50 feet;" that the well was to be "approximately 200-260' feet deep, or to bottom of strata;" and that it would supply "50 GPM [gallons per minute] if available from well," elsewhere there appeared the following:

> "I understand that the above well depth is approximate and may vary from 5 ft. to 25 ft. depending on formation, location and test information; also that the well will produce approx. 25-50 G.P.M. . . . If proper water is not located in the well, or well cannot be properly developed, the buyer will only pay for drilling costs instead of above contracted price. No specific guarantee is given concerning *quality of water.* Well price does not include pump or pipe installation unless specified.
>
> "*Seller shall not be responsible* for damages of any amount or kind resulting from delays, causes or circumstances beyond the reasonable

ability of seller to control. . . ." (emphasis added).

By July or August, 1969, the well had been dug and was used during the construction of the building. Claiming that Delmarva had pronounced the water fit, Tuckahoe hooked up its building water supply system to the well in late September. The Deans opened their laundromat in November, but were forced to close after some ten days or two weeks because, as Mr. Dean vividly described: "It [the water] was dirty. It smelled like toilet water. . . . You could catch it out of a spigot, hold a rag under a spigot . . . and catch it. It was right black, a black ring."

This condition caused the washing machines to clog and resulted in immediate complaints to Tuckahoe, which must not have been taken entirely by surprise, since there had been similar indications during the construction stage. Tuckahoe's owners immediately checked the well, which had been dug to a depth of 170 feet, and then contacted Delmarva. After tinkering with it, the latter again pronounced the water fit; the washers were hooked up, but the water difficulties recurred.

Delmarva finally rectified the problem about March 1, 1970, by digging not one, but two more wells, the last of which was driven to 270 feet. In the period which had previously ensued, as a result of the two disastrous efforts to operate their business, the Deans incurred damages for necessary repairs to the washing machines and a far-ranging list of consequential damages. Essentially, they resulted from the costs incurred in advertising the twice-aborted openings of their business, certain fixed costs that were not abated by the closings, and interest on a portion of their capital investment.

Prior to the initial opening of the business, when the poor quality of the water was first detected during the construction phase, Delmarva conducted an analysis and forwarded to Tuckahoe on October 10, 1969 a rather detailed, technical prescription for correcting the water

problem. Since it all added up to an additional charge of well over $2,000, Tuckahoe must have concluded that "the cure was worse than the disease." In any event, Tuckahoe declined to follow the recommendation, and the situation seemed to linger on until the third well solved the dilemma in March.

At the conclusion of the trial, which was presided over by Judge Turner sitting without a jury, judgment was entered in favor of the Deans against Tuckahoe in the sum of $2,399.63, and also in favor of Tuckahoe on its third-party action against Delmarva.

In attacking the judgment entered in favor of the Deans, Tuckahoe raises two points: First, it contends, as it did below, that the Deans are barred from recovery because of Paragraph 16 (a) of the lease which, in relevant part, provides:

> "*WAIVER OF CLAIMS* 16. (a) Landlord and Landlord's agents, employees and contractors shall not be liable for, and Tenant hereby releases all claims for, damage to person or property sustained by Tenant or any person claiming through Tenant resulting from any *fire, accident, occurrence or condition in or upon the demised premises or building* of which they shall be a part, including but not limited to such claims for damage resulting from (i) any defect in or failure of plumbing, heating or air conditioning *equipment,* electric wiring or installation thereof, water pipes, stairs, railings or walks; (ii) any *equipment* or appurtenances becoming out of repair; (iii) the *bursting, leaking or running* of any tank, washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about such building or premises; (iv) the *backing up* of any sewer pipe or downspout; (v) the *escape* of steam or hot water; (vi) water, snow, or ice being upon or

*coming through* the roof or any other place upon or near such building or premises or otherwise; . . ." (emphasis added).

Secondly, Tuckahoe argues that the evidence of damages presented by the Deans was not "sufficiently definite and certain to support the Court's award."

### (1) (a)

The Deans' response to the "waiver" argument is bottomed on Maryland Code (1957, 1972 Repl. Vol.) Art. 53, § 40, which, they say, constitutes 16 (a) as the type of exculpatory clause that may not be asserted to bar their claim. In the view we take of this issue, it becomes unnecessary for us to decide whether § 40 is controlling or whether it applies only to actions *ex delicto* brought against a landlord; for, we are of the opinion that the "waiver" provision has no application to the facts of this case and hence, does not bar the Deans' claim.

A close analysis of 16 (a) reveals an intention to bar only those claims caused by one of the following: by *damage* to the building or the premises on which it is situated; by an episodic occurrence; or by defective equipment present on or connected to the premises. The water condition complained of here, which we regard as the equivalent of no water at all, was not due to any of the possible causes enumerated in 16 (a), but, as it turned out, was merely the result of the first well not being dug deeply enough. Rather than being predicated on any of the causes listed in 16 (a), the Deans' case is a simple one, the failure to supply water as Tuckahoe had agreed to do in the provision quoted earlier.

As we have consistently held, the intention of the parties to an agreement must be garnered from the terms considered as a whole, and not from the clauses considered separately, *The Kasten Construction Company, Inc. v. Rod Enterprises, Inc.*, 268 Md. 318, 301 A. 2d 12 (1973) ; *Perper v. Fayed*, 247 Md. 639, 234 A. 2d 144 (1967) ; *Wheaton Lanes v. Rinaldi*, 236 Md. 525, 204 A.

2d 537 (1964). It was hardly necessary for Tuckahoe to be told that water was critical to the operation of the laundromat. This was virtually acknowledged by imposing the special charge for what was quite logically expected to be an abnormal consumption of water. To say that the Deans, while committed to a rather formidable lease, bargained for water in one breath and waived their right to sue for damages caused by a breach of that agreement in the next, is more than we can accept.

### (1) (b)

We think that Rule 886 is a complete answer to Tuckahoe's challenge to the damages claimed by the Deans. It should hardly be necessary to repeat at this point that in reviewing the action of the court below, we must consider the evidence in a light most favorable to the prevailing party; and if substantial evidence was presented in support of the trial court's determination, then it is not clearly erroneous, *A.S. Abell Co. v. Skeen,* 265 Md. 53, 55, 288 A. 2d 596 (1972) ; *Crosse v. Callis,* 263 Md. 65, 70-71, 282 A. 2d 86 (1971) ; *Frisoen v. Trapp,* 258 Md. 629, 633, 267 A. 2d 143 (1970).

While corroboration of the damages may have been a little thin in some places, our review of the evidence persuades us that it was sufficient to support the judgment entered in favor of the Deans against Tuckahoe. Accordingly, we shall not disturb that ruling.

### (2)

We turn now to a consideration of the appeal from the judgment entered on the third-party claim against Delmarva. In disposing of that claim, Judge Turner noted the provision in the contract that "[n]o specific guarantee is given concerning quality of water" and that "seller shall not be responsible for damages of any amount or kind resulting from delays, causes or circumstances beyond the reasonable ability of seller to control." He stated, however:

"This instrument is, in the opinion of the Court, a *mere skeleton memorandum;* however, it is a valid agreement." (emphasis in original).

He went on to hold:

"[T]hat the subsequent efforts of Delmarva to obtain usable water, which was finally accomplished by drilling a deeper well, *were a clear indication that usable water had been intended when the agreement was executed.*" (emphasis in original).

In effect, therefore, he ruled that Delmarva had breached a contract to supply usable water to Tuckahoe.

In addition, Judge Turner concluded that Delmarva was liable in tort for fraudulently representing that it *"could* and *would* produce usable water[;] that they [Delmarva] were familiar with the soil strata in that area [and that these] were statements of facts recklessly made." (emphasis in original).

The trial judge's conclusion that Delmarva was liable on both the contract and fraud theories apparently rests on testimony by one of Tuckahoe's officers that while the contract was being executed, a Delmarva official stated "that he was very familiar with the area, he had drilled quite a number of wells, knew the right strata that he needed in order to get the 50 gallons a minute of good usable water." There were other statements attributed to Delmarva that might be characterized as assurances that the water was "now" fit, but these were all made during the period between August, 1969 and February, 1970, all of which was subsequent to the completion of the well and its initial operation, and quite naturally, long after the contract was executed. Hence, they cannot be the basis for liability.

We entertain considerable doubt that liability can be sustained on the strength of the statement quoted above even apart from the disclaimer provision in the contract, since, on its face, it appears to fall somewhat short of an actionable promise or representation. In any event, we

think that the trial judge erred in entering a judgment on the third-party declaration, and we shall reverse the court's action for the following reasons.

In admitting the oral statement into evidence and holding that it supported a case for breach of contract, Judge Turner overlooked a number of our prior decisions enunciating the parol evidence rule. In *Pumphrey v. Kehoe*, 261 Md. 496, 276 A. 2d 194 (1971), Judge Barnes, quoting from *Eastover Stores, Inc. v. Minnix*, 219 Md. 658, 666, 150 A. 2d 884 (1959), aptly stated for the Court that:

> ". . . 'parol evidence is inadmissible to vary, alter or contradict a writing which is complete and unambiguous, where no fraud, accident or mistake is claimed, [citation omitted] but where doubt arises as to the true sense and meaning of the words themselves or difficulty as to their application under the surrounding circumstances, the sense and meaning of the language may be investigated and determined by evidence *dehors* the instrument.' " 261 Md. at 504.

Here, the contract was clear and unambiguous on its face and hence, as a matter of substantive law, parol evidence of a prior or contemporaneous promise to supply "usable water" could not be admitted to contradict a written contract providing that "[n]o specific guarantee is given concerning quality of water."

Nor was that testimony admissible to show the intention of the parties. We have repeatedly held that when the language of a contract is clear and unambiguous, as we say this was, the true test of what was meant is not what a party to the contract may have intended to mean, but what a reasonable person in the position of the parties would have thought it meant, *The Kasten Construction Company, Inc. v. Rod Enterprises, Inc., supra; U.S.I.F. Triangle v. Rockwood Dev. Co.*, 261 Md. 379, 275 A. 2d 487 (1971) ; *Seldeen v. Canby*, 259 Md. 526, 270 A. 2d 485 (1970).

As we have noted, Judge Turner was also of the view that Delmarva was liable to Tuckahoe in tort for what he termed a "negligent misrepresentation." Our predecessors held, in accordance with what continues to be the prevailing weight of authority, that there can be no recovery in an action for deceit on the ground of negligent misrepresentation, *Appel v. Hupfield,* 198 Md. 374, 84 A. 2d 94 (1951) ; *Holt v. Kolker,* 189 Md. 636, 57 A. 2d 287 (1948). Moreover, the evidence here does not support a cause of action for fraudulent misrepresentation for the further reason that the statement relied upon by the trial court, "that they [Delmarva] *could* and *would* produce usable water," was merely a promise at most; and since one of the elements of fraud is the representation of a past or existing fact, it cannot ordinarily be predicated upon statements which are promissory in nature. Therefore, such an action will not lie for the unfulfillment of promises or the failure of future events to materialize as predicated, *Appel v. Hupfield, supra,* at 379; *see Levin v. Singer,* 227 Md. 47, 175 A. 2d 423 (1961). Not only was the statement here promissory in nature, but Tuckahoe failed to present any evidence that it was made with the intention of not performing.

Accordingly, we have concluded that recovery on the third-party declaration cannot be sustained on either of the theories relied upon by the trial judge, and hence that the judgment must be reversed.

> *Judgments in favor of Howard Aldy Dean, Jr. and Lillian Marie Dean against Tuckahoe Shopping Center, Inc. affirmed; judgment in favor of Tuckahoe Shopping Center, Inc. against Delmarva Drilling Company, Inc. reversed; Tuckahoe Shopping Center, Inc. to pay costs.*