979 A.2d 250

MI BONG HONG

v.

CHONG CHIN CHA.

No. 0507, Sept. Term, 2008.

Court of Special Appeals of Maryland.

Aug. 31, 2009.

George F. Obrecht, III (Obrecht and Obrecht, on brief), Sevrna Park, for Appellant.

David F. Clinnin, Towson, for Appellee.

Panel: HOLLANDER, ZARNOCH and KEHOE, JJ.

KEHOE, J.

Mi Bong Hong ("Ms. Hong") appeals a judgment entered against her in favor of Chong Chin Cha ("Ms. Cha") by the Circuit Court for Anne Arundel County in the amount of $104,795.26.

## Background

The instant appeal is the second time the parties' case has been before this Court. The parties' first appellate journey resulted in an unreported opinion by a panel of this Court authored by Judge Kenney. *Mi Bong Hong v. Chong Chin Cha, et al.,* No. 2115, September Term, 2005 (filed June 18, 2007) (*"Cha I "*). We set forth the *Cha I* panel's statement of facts, supplementing it as necessary.

This case involves what the parties and witnesses refer to as a "Korean money club." [1] According to the evidence at

---

1. A Korean money club or "gye" (sometimes transliterated as "gwae", "kye" or "keh") is a rotating credit group. A rotating credit group:

   typically consists of a small number of people (ten to thirty), who periodically contribute money to a pot. At the beginning of each period, one member takes the pot. Members determine the recipient by lottery or bidding. Failure to make timely payments and other breaches result in nonlegal sanctions such as criticism that, carried along the channels of gossip, injures the defaulter's reputation and may lead to social ostracism. When everyone has taken one pot, the group dissolves.

   Eric A. Posner, *The Regulation of Groups: The Influence of Legal and Nonlegal Sanctions on Collective Action,* 63 U. Chi. L.Rev. 133, 169 (1996).

   In Korea, gyes are:

trial, individuals purchase "shares" in such clubs for a predetermined amount payable in monthly installments. The members of the club meet once a month. At the

financial clubs with a social element dating back thousands of years. Gye members contribute funds, typically on a monthly basis, to a pool to accumulate large sums for children's education and weddings, travel or the purchase of major appliances. Members typically share a common connection through family, neighborhood, employment or school background. When a member's turn comes, they are entitled to use the accumulated funds.
Lown, Jean M. and Ju, In–Sook, *Adapting Western Financial Education And Counseling Models For Use In South Korea,* Association for Financial Counseling and Planning Education, Volume 11(1), p. 64 (2000); available at http://www.afcpe.org/publica tions/journal-articles.php?volume=111 & article=199.
Traditionally, gyes were an important means of building and maintaining community ties in Korean society, and were sometimes formed for social, not financial, reasons. The oldest existing gye, which dates back to the mid-fifteenth century, began as a study group of young noblemen preparing for state examinations. Today, their descendants still meet quarterly to discuss philosophy and political ideals. Eun-joo, Lee, *Dabakhoe Savings Group is Latest Gye Gone Bad,* JoongAng Daily, December 2, 2008 (available at http://joongangdaily.joins.com/article/view.asp?aid=2898049).
With the advent of Western-style financial institutions in Korea, the importance of gyes has decreased in that country. Nonetheless, at least until recently, they played a significant role in Korean society: in 1993, 20% of the population of South Korea participated in gyes and it was estimated that, in 1998, gyes and similar social groupings accounted for 13% of the total assets of urban Korean families. Lown and Ju, *supra,* 65.
Gyes play an important role in providing financing for Korean Americans; in 1999, it was estimated that 80% of Korean households in the United States participated in at least one gye and that, in the Washington, D.C. metropolitan area, approximately $100 million was held by gyes at any given time. Lan Cao, *Looking at Communities and Markets,* 74 Notre Dame L.Rev. 841, 878 (1999).
Many other cultures also have a tradition of rotating credit groups that are analogous to gyes. Counterparts include "cundina" (Mexico); "tanamoshi" (Japan), and "esusu" (West Indies and West Africa); "hui" (China and Viet Nam); "tong ting" (Cambodia) and "ekub" ("Ethiopia"). *Id.* at 874. Likes gyes, these groups have played a significant role in fostering the economic development of immigrant communities in the United States. *Id.* at 879.
As gyes and other rotating credit associations have traditionally served as an informal but efficient means of raising capital by groups who traditionally have limited access to conventional financing, they have attracted a significant amount of scholarly attention. *See, e.g.* Gao, *supra* n. 129 and sources cited therein; Posner, *supra.*

meeting, the organizer of the club, referred to in this case as the "president," collects the members' monthly installments and conducts a lottery. The lottery "winner" is entitled to the monthly payments collected at the next month's meeting. The meetings continue until each share owner has received a monthly payout.

In some clubs, after a member has received a payout, they pay an additional monthly fee or, as referred to in this case, an "interest" payment, in addition to their regular monthly share payment. This additional payment is some incentive for members to receive a later payout.

Ms. Hong has organized numerous money clubs during the last thirty years. She testified that such clubs are a common means for Korean immigrants to borrow capital for business or personal investment.

Ms. Cha has participated in several of Ms. Hong's other money clubs. She also has borrowed money from Ms. Hong outside of the money clubs. Ms. Hong organized the money club giving rise to this case in 2000. When the club began in June 2000, Ms. Cha owed Ms. Hong $65,000 in personal loans. Ms. Cha joined the money club with the intent of using her payout to repay the debt to Ms. Hong.

In this club, the monthly payment on a share was $2,000. Payments ordinarily were made at the monthly meetings, but sometimes Ms. Hong would collect the payments from the members prior to the meeting. The parties disagree on whether interest payments were required.

Ms. Hong, as the president, was entitled to the first payout. She, however, agreed that Ms. Cha would receive the first monthly payout to satisfy Ms. Cha's debt to her. Ms. Hong, in turn, would take Ms. Cha's payout when Ms. Cha later won the monthly lottery. An October 20, 2000 memorandum written by Ms. Hong memorializes that, on June 26, 2000, Ms. Cha received a club payout of $86,000. From the $86,000, Ms. Cha paid Ms. Hong $65,000 in repayment of Ms. Cha's debt.

This case centers around whether Ms. Cha purchased not one but two, shares in the club. She claims that not only did she pay for the share that yielded the initial payout that enabled her to repay her debt to Ms. Hong, but that she also paid for a second share.

The last monthly meeting of the club was in February 2004. Ms. Cha filed suit in March 2004, and an amended complaint in July 2004.[] She alleged that she had paid $2,000 per month for the second share from June 2000 to February 2004, and that she expected to receive the February 2004 monthly payout. She averred that Ms. Hong refused to pay her the second payout because Ms. Cha's sister owed Ms. Hong money. Ms. Cha pleaded four counts: (1) breach of express contract; (2) breach of implied contract; (3) breach of fiduciary duty; and (4) accounting. She sought $104,000 in compensatory damages, and $500,000 in punitive damages.

*Id.,* slip op. at 3–5.

After a four day bench trial, the circuit court issued a memorandum opinion and judgment. Preliminarily, the circuit court found that Ms. Hong entered into a separate contract with each club member for each share that the member purchased; that the terms of each contract were established by the club rules announced by Ms. Hong at the club's initial meeting; and that Ms. Cha purchased two shares.

With regard to Ms. Cha's contract for the second share, the circuit court found:

The terms of the parties' second contract provided that, if Ms. Cha made the monthly payments on her second share, she would receive the payout on that share in an amount equal to $2,000 times the number of club members. **The contract also required Ms. Cha to pay $500 interest per month after she received the payout**....

**The evidence established that Ms. Cha breached the terms of that contract by failing to perform her duty to pay the monthly fee on her second share.** Unfortunately, the parties' contract (that is, Ms. Hong's rules as modified)

did not specify the parties' rights, duties, remedies or penalties in the event of Ms. Cha's failure to make full and timely payments. There was no evidence, however, that the contract allowed Ms. Hong to unilaterally refuse to make some kind of payout to Ms. Cha. The plaintiff made significant, if untimely and incomplete, payments to Ms. Hong toward the second share. Ms. Hong did not pay that money to another member and presumably kept it. Defendant will realize an unconscionable windfall and Ms. Cha will incur an unconscionable penalty if Defendant retains that money. Because we cannot divine from the parties' agreement, what remedy, if any, they provided for the circumstance, we cannot enter a judgment in favor of Ms. Cha under this breach of contract claim. Accordingly, Ms. Cha has no adequate remedy of law and, therefore, we consider her equity claim (accounting) below. (Emphasis added.)

As to Count II (breach of implied contract), the circuit court found:

Count II fails for the same reasons as ... Count I .....
Assuming there was an implied contract with Ms. Hong, there was no clear understanding of what would happen if Ms. Cha made some but not all payments under her second share.

The circuit court entered judgment on Ms. Hong's behalf on the breach of fiduciary duty count.

Finally, with regard to Count IV (accounting), the circuit court first found that the evidence established a confidential relationship between Ms. Hong and Ms. Cha. It concluded that it had the equitable power to decree the payment of the amount found to be due from the plaintiff to the defendant. The circuit court continued:

The evidence established that from June, 2000 to December, 2003, Ms. Cha paid $191,000.00 into the club. Of that amount, $107,000.00 was paid towards the first share; that is, $2,000.00 for the June 2000 meeting plus $2,500.00 for each of the 42 subsequent meetings. **The remaining $84,000.00 represents payments for the second share.** We

will enter judgment in that amount as a fair and equitable remedy to plaintiff's claim for an accounting.

**Although plaintiff claims that she is entitled also to the interest other club members paid before the December, 2000 meeting, she failed to carry her burden of proof on this claim. The evidence was simply too conflicting and did not demonstrate by a preponderance that club members received interest payments as part of the payout.** We will, however, award pre-judgment interest calculated at the legal rate calculated from January 1, 2004, which comes to $8,400.00. (Emphasis added.)

The circuit court entered judgment accordingly. Ms. Hong appealed the court's judgment, and Ms. Cha filed a cross-appeal.

Ms. Hong raised two issues that are pertinent to the instant case:

1. Did the circuit court clearly err in finding that Ms. Cha had paid for a second "share" in the money club?

2. Did the circuit court err in ruling for Ms. Cha in her action for an accounting?

On cross-appeal, Ms. Cha presented two pertinent issues:

1. Did the circuit court err in failing to include the amount of $20,000.00 in interest payments made by club members in the judgment for [Ms. Cha]?

2. Did the circuit court err in entering judgment for [Ms. Hong] on [the contract counts] because the agreement between the parties did not specify a remedy for breach of contract? [2]

The *Cha I* panel affirmed the circuit court's disposition of the breach of fiduciary duty counts. *Id.*, slip op. at 41.

---

[2]. Ms. Hong also raised issues pertaining to Ms. Cha's standing and the lack of a necessary party. Ms. Cha also argued that the circuit court erred in dismissing the breach of fiduciary duty count. None of these are relevant to this appeal.

With regard to the accounting claim, the panel held that a confidential relationship is not dependent upon the existence of a valid contract, *id.* at 34, and that "the evidence support[ed] the circuit court's finding that Ms. Cha placed special confidence in Ms. Hong, and that a confidential relationship existed." *Id.* at 35. Judge Kenney explained:

[A]n accounting "is a restitutionary remedy based upon avoiding unjust enrichment. In this sense, it reaches monies owed by a fiduciary or other wrongdoer, including profits produced by property which in equity and good conscience belonged to the plaintiff." Slip Opinion 27, quoting J. Eichengrun, *Remedying the Remedy of Accounting,* 60 Ind. L.J. 463 (1985).

However, the panel was unable to reconcile the circuit court's finding, made in conjunction with Ms. Cha's accounting claim, that she had made $84,000 in monthly payments on the second share with its finding, made in conjunction with the breach of contract claims, that the evidence established that Ms. Cha failed to perform her duty to make the monthly payments. Similarly, the panel was unable to reconcile the circuit court's conclusion, made in conjunction with its ruling on the accounting claim, that "[t]he evidence was simply too conflicting and did not demonstrate by a preponderance that club members received interest payments" with the circuit court's finding, made in conjunction with its ruling on the contract claims, that the contracts obligated members to pay interest after they had received their payouts. The *Cha I* panel vacated the circuit court's judgment as to the express and implied contract counts and the accounting count and remanded the case to the circuit court so that it could resolve these inconsistencies. *Id.,* slip op. at 41.

On October 26, 2007, the circuit court conducted a hearing on remand. The circuit court issued a memorandum opinion on April 16, 2008, to "modif[y], clarif[y] and supplement[ ]" its previous opinion. The circuit court stated that Ms. Cha purchased two shares in a money club operated by Ms. Hong. The circuit court addressed the inconsistency in its previous

findings with regard to the obligation of club members to pay interest:

> A preponderance of the evidence demonstrated that Club members were required to make monthly $500.00 "interest" payments after receiving a payout. Those payments were in addition to the regular payments of $2,000.00.

With regard to the second share, the court found:

> Ms. Cha made undesignated payments totaling $84,000.00 to Ms. Hong. There was no understanding between the parties as to which of Ms. Cha's various payments was intended to constitute the $2,000.00 payments and what, if any, constituted $500.00 interest payments. However, it is sufficient for purposes of the judgment we enter herewith to find, as we do, that Ms. Cha's undesignated payments totaled $84,000.00.

The circuit court stated that "it is apparent that there was simply no binding contract between the parties." Further, the circuit court stated:

> Assuming *arguendo* that the parties entered into a contract, express or implied, Ms. Cha's failure to make timely and complete payments constituted a material breach of that contract. The club members were entitled to receive their payout when the monthly lottery drawing occurred. The success of the Club depended upon each participant to pay his/her installment at or before the drawing. Ms. Cha's failure to make timely payments placed the success of the club at risk and exposed its members to financial loss.

The circuit court reiterated its finding that Ms. Cha did not have a remedy arising out of express or implied contract. Accordingly, the circuit court once again entered judgments in favor of Ms. Hong on Counts I and II of the amended complaint.

With regard to the accounting claim, the circuit court found that Ms. Hong had served as " '[p]resident' of several money clubs over three decades, determining their rules, collecting member's payments, conducting the lotteries and distributing

the payouts. Indeed, she operates as a private bank in the Korean community." It said:

The parties had a confidential relationship in which Ms. Cha placed special confidence in Ms. Hong, who was significantly more sophisticated than Ms. Cha. Ms. Hong had previously loaned significant amounts of money to Ms. Cha, allowed her to participate in the money clubs, not only for Ms. Cha's benefit but also as a means to reimburse these loans to Hong. Ms. Cha, in turn, placed her confidence in Ms. Hong and reasonably presumed that Ms. Hong would not act inconsistently with her interest.

With regard to the money club before us, Ms. Hong kept no reliable or readily available record of the $84,000.00 she collected from Ms. Cha (or similar payments collected from the other members) during the many months that the club was active. Ms. Hong withheld monies from Ms. Cha's payouts to satisfy unrelated debts owed to Ms. Hong by Ms. Cha and her sister. Ms. Hong kept no discernable record of: the date or amount of each payment made by Ms. Cha; the allocation of those payments to the first or second share; and the designation of those payments as regular or interest payments. Ms. Hong also provided no receipts for payments made by Ms. Cha. We note that Ms. Hong determined the club rules (which she did not reduce to writing) and administered its assets (of which she distributed no periodic statement). The evidence demonstrated differences in members' interpretations of their rights and duties. Perhaps more than other members, Ms. Cha relied upon the experience of Ms. Hong to treat her fairly. Under those circumstances, grounds for an accounting claim were proven.[3]

---

**3.** The analytical approach employed by the circuit court, namely, to ascertain the specific terms of the gye from evidence from the participants, to treat the participants of the gye as having a contract with the organizer, and to impose equitable remedies in order to avoid unjust enrichment, is consistent with the extremely sparse authority from other jurisdictions pertaining to revolving credit associations. *See Heylin v. Yil,* 30 Haw. 606, 608–609 (1928) (terms of a tanamoshi must

The circuit court ruled that Ms. Cha was entitled to reimbursement of the $84,000.00 that she paid to Ms. Hong for the second share, together with pre-judgment interest totaling $20,795.26. The circuit court entered judgment accordingly and this appeal followed.

## Question Presented

Appellant presents a single issue:

Did the circuit court err in awarding judgment for Ms. Cha on the accounting claim in the full amount she claimed she paid for the second share where the court rejected the contract claims on the basis of its specific findings that Ms. Cha's payments were "incomplete", and that she "fail[ed] to perform her duty to pay the monthly fee on her second share", and that assuming *arguendo* a contract existed, her "failure to make timely and complete payments constituted a material breach of that contract precluding her right to enforce its terms"?

For the reasons discussed below, we find that the circuit court did not err.

---

be determined on a case-by-case basis; case remanded for that purpose); *Okada v. Akahoshi,* 29 Haw. 719, 732–733 (1927) (participant in a tanamoshi is entitled to enforce its terms and obtain return pledged collateral). In contrast, Professor Cao advocates limiting judicial intervention in revolving credit association disputes to matters involving fraud, lack of capacity and similar issues. Cao, *supra,* 899.

Other than the two Hawaiian cases cited above, our research discloses only two other reported appellate decisions involving gyes or similar revolving credit groups. Two decisions of the Supreme Court of the Territory of Guam pertain to collection actions in which the plaintiffs sought to enforce post-dated checks. The defendant alleged that the checks were intended to evidence his promise to reimburse the plaintiffs for plaintiff's payments to a failed gye organized by the defendant's wife. *Yang v. Hong,* 1998 WL 376357 (Guam Terr.1998); *Kim v. Hong,* 1998 WL 817699 (Guam Terr.1997). Neither of these cases involves the legal duty of a gye organizer to a participant.

Professors Cao and Posner both attribute the lack of litigation phenomenon to strong social pressures for participants to fulfill their obligations in order to maintain their reputations within their ethnic communities. Posner, *supra,* 170; Cao, *supra,* 882–883.

## Standard of Review

We review the circuit court's factual findings using a clearly erroneous standard. Maryland Rule 8–131(c). As the Court of Appeals explained in *Murphy v. 24th Street Cadillac Corp.*, 353 Md. 480, 497, 727 A.2d 915 (1999):

> We have consistently interpreted the clearly erroneous standard to require the appellate courts to "consider the evidence produced at trial in a light most favorable to the prevailing party." *Geo. Bert. Cropper, Inc. v. Wisterco*, 284 Md. 601, 620, 399 A.2d 585 (1979). So long as substantial evidence is presented to support the trial court's determination, the appellate court is bound by the trial court's factual findings and they will not be disturbed on appeal. *Id; Ryan v. Thurston*, 276 Md. 390, 391–92, 347 A.2d 834 (1975); *Delmarva Drilling Co. v. Tuckahoe Shopping Center, Inc.*, 268 Md. 417, 424, 302 A.2d 37 (1973). "The trial court is not only the judge of a witness' credibility, but is also the judge of the weight to be attached to the evidence." *Thurston*, 276 at 392, 347 A.2d 834.

In contrast, reviewing courts do not pay deference to a trial court's rulings on matters of law. *Garfink v. Cloisters at Charles, Inc.*, 392 Md. 374, 383, 897 A.2d 206 (2006).

## Discussion

The appellant devotes a great deal of her brief to the issue of Ms. Cha's right to a remedy in contract in light of the circuit court's findings that Ms. Cha failed to make timely and complete payments on the second share. In this appeal, Ms. Cha does not contest the circuit court's ruling against her on the contract counts. Therefore, we need not address appellant's contentions on this score.

With regard to the remaining issue, Ms. Hong contends:

> Ms. Cha's burden at trial was to produce competent material evidence legally sufficient to sustain her claim that she paid for two shares. She failed to meet that burden, as

the trial court's specific findings of fact make clear. Those findings foreclose the accounting claim as well.

\*     \*     \*     \*     \*     \*

The trial court's award on the accounting claim was predicated on the court's conclusion that a confidential relationship existed between the parties, thus creating a duty for Ms. Hong to account to Ms. Cha for her payments. However, if such a confidential relationship existed, it would have existed only in relation to payments Ms. Cha actually made toward the alleged second share. The trial court found that Ms. Cha's payments were "sporadic" and so "untimely" and "incomplete" as to constitute a material breach of the contract, if one existed, thus "precluding her right to enforce its terms." Ms. Hong would have no duty to account for payments Ms. Cha did **not** make, and as earlier pointed out, the court did not and, on the evidence, could not quantify the payments she did make. Hence there was no legal or equitable basis for an accounting and, consequently, no predicate upon which to award the ancillary money judgment. (Emphasis in original.)

Appellant's arguments are not persuasive.

■■ As previously noted, the *Cha I* panel held that a confidential relationship was not dependent upon the existence of a valid contract, Slip Opinion 34, and that a confidential relationship existed between Ms. Hong and Ms. Cha. *Id.* at 35. The rulings in the first appeal constitute the law of case and, as such, are binding upon the litigants. *Scott v. State,* 379 Md. 170, 183, 840 A.2d 715 (2004) ("[O]nce an appellate court rules on a question presented on appeal, litigants and lower courts become bound by the ruling, which is considered the law of the case."); *Goldstein & Baron Chartered v. Chesley,* 375 Md. 244, 253, 825 A.2d 985 (2003). Thus, for the purpose of this appeal, the confidential relationship between Ms. Cha and Ms. Hong has been conclusively established and the existence *vel non* of an enforceable contract between the parties is irrelevant.

■ Appellant's contention that Ms. Hong's duties to Ms. Cha arising out of their confidential relationship "would have existed only in relation to payments Ms. Cha actually made towards the alleged second share" is correct in the context of the issues raised in this appeal. Ms. Hong argues that she would have no duty to account for payments that Ms. Cha did not make, which is also correct, and that the court did not and, on the evidence, could not, quantify the payments she did make. The last two statements are incorrect.

The circuit court explicitly found in both its 2005 opinion and its 2008 opinion that Ms. Cha paid $84,000.00 to Ms. Hong for her second share in the club. As the circuit court observed, there was sharply conflicting testimony as to the amount of Ms. Cha's payments. While the paucity of written records and language barriers made the circuit court's fact-finding duties especially difficult, we conclude that there was substantial evidence to support the circuit court's conclusion that Ms. Cha paid $84,000 towards her second share.

The most significant support for the circuit court's finding is Ms. Cha's own testimony. Ms. Cha testified that she paid $4,500 for 41 months, $4,000 for one month, and $2,500 for one month, totaling $191,000.00. Ms. Hong's testimony contradicted Ms. Cha's. However, there is additional evidence to support the circuit court's finding that Ms. Cha paid $84,000 towards the second share. This evidence either corroborated in part Ms. Cha's version of events or undermined Ms. Hong's credibility.

The parties signed a memorandum on October 20, 2000. In translation, the memorandum [4] stated:

On June 25, 2000 we began our gye with $86,000. Used $65,000 for debt payment. The remainder was $21,000. In June $5,000 (gye money $4,000 and $1,000 as interest) was given. From July to October, gye money $10,000 given. Total $15,000 given. Subtracting $15,000 from the remaining $21,000 leaves $6,000. Cha Chang In took $6,000 in

---

4. The memorandum is in Korean.

cash. It was promised that the check of $65,000 as surety would be returned at the end of the gye term.

Ms. Hong and Ms. Cha both testified about the meaning of the memorandum. Ms. Cha testified that the June payment of $5,000 represented payments of $2,000 per share for two shares plus the additional interest payment. Ms. Hong testified the $4,000 June payment was not for payments toward a second share, but that "[t]he $4,000 was the June payment. Also, the one before this club she had joined and also that club, which she dropped five months later, and she owed me $2,000 in that club." As translated, the memorandum is hardly a model of clarity but it does not support Ms. Hong's version of events. Similarly, Ms. Cha testified that the $10,000 represented four months of payments for one share, but that she continued to pay $2,000 each month, in addition to the prepaid $10,000, for the dues on her second share. Ms. Hong testified that the $10,000 was Ms. Cha's total payments for the four months of July through October. Ms. Hong could not explain why, if Ms. Cha only had one share at $2,000 per month, the $10,000 would not have paid for five months' dues:

> I kept trying to remember what ... happened that $10,000. I don't know whether we miscalculated a month or something; she had some kind of balance due because we have so many transactions between and I could not really clearly remember."

Aside from the transactions referenced in the memorandum, the bulk of the club payments were unrecorded (or, if recorded, Ms. Hong's practice was to destroy the records after each meeting).

Ms. Hong testified that sometimes she would go to Ms. Cha's store to pick up her payment. The payments were usually in cash and in a brown paper bag. Ms. Hong testified that the bag usually contained $2,000 or less, and that on the few occasions when the payment exceeded $2,000, the excess was to repay a debt to Ms. Hong. Kyong Sang Kang, one of Ms. Cha's employees, contradicted Ms. Hong's testimony on this point. Ms. Kang testified that Ms. Cha would sometimes

entrust her with the bag to give to Ms. Hong. Ms. Kang testified that she counted the money, and the bag contained $4,500—representing payments of $2,000 per share for two shares, as well as an additional $500 interest payment on the first share that Ms. Cha had already received.

The circuit court's findings as to the amount paid by Ms. Cha on the second share were also based upon a favorable assessment of her credibility:

> In short, the evidence with regard to whether Ms. Cha paid all, most or very few of the payments on her second share was conflicting. However, it is the conclusion of this Court that Ms. Cha made payments on that share totaling $84,000.00. We make that conclusion for several reasons. Ms. Cha had previously participated in clubs with Ms. Hong, considered Ms. Hong a friend and the only meaningful vehicle to finance family business projects and appeared, in court, to be somewhat intimidated by Ms. Hong. Ms. Cha had no motive to fabricate this lawsuit with its substantial risk of failure. Had she fabricated her claim, she likely would have also fabricated documentation to support her venture. Finally, as we have said, Ms. Hong created and operated this club; she collected, safeguarded and distributed the money. Yet Ms. Hong could not definitively establish to this Court's satisfaction when the plaintiff and/or her sister made payments on a second share and when they did not.

"The trial court is not only the judge of a witness' credibility, but is also the judge of the weight to be attached to the evidence." *Ryan v. Thurston, supra,* 276 Md. at 392, 347 A.2d 834. The finding by the circuit court that Ms. Cha paid $84,000.00 for the second share was not clearly erroneous.

**JUDGMENT AFFIRMED; APPELLANT TO PAY COSTS.**